287 S.W.3d 43 (2008)
Jesus Perez SALDAÑA, Appellant,
v.
The STATE of Texas, Appellee.
No. 13-06-180-CR.
Court of Appeals of Texas, Corpus Christi-Edinburg.
February 21, 2008.
Discretionary Review Refused October 29, 2008.
Rehearing Overruled March 20, 2009.
*47 Philip T. Cowen, Brownsville, for appellant.
Jesus Perez Saldaña, Huntsville, pro se.
Nathan Tadema, Asst. Atty. Gen., Austin, Armando R. Villalobos, Dist. Atty., Lawrence John Rabb, Asst. Dist. Atty., for appellee.
Before Justices RODRIGUEZ, GARZA, and BENAVIDES.

OPINION
Opinion by Justice BENAVIDES.
By nine issues, appellant Jesus Perez Saldaña challenges his convictions for one count of indecency with a child by contact, TEX. PENAL CODE ANN. § 21.11(a)(1) (Vernon 2003), and two counts of aggravated sexual assault, TEX. PENAL CODE ANN. § 22.021(a) (Vernon Supp.2007). The trial court sentenced Saldaña to thirty-five years' imprisonment in the Texas Department of Criminal Justice, Institutional Division, for each count, with the sentences to run consecutively, for a total of 105 *48 years. Because we find that the conviction under Count I of the indictment for indecency with a child by contact violates the Double Jeopardy Clause of the Fifth Amendment, we vacate the conviction for that count and reform the trial court's judgment of conviction to reflect our decision. In all other respects, we affirm.

I. BACKGROUND
On January 23, 2003, Jesus Perez Saldaña was indicted on two counts of aggravated sexual assault and two counts of indecency with a child. The complainants were two sisters, B.B. and B.A. Count I of the indictment alleged that Saldaña intentionally or knowingly engaged in sexual contact with B.B., a child younger than seventeen years of age and not Saldaña's spouse, by touching her genitals with his finger. Count II of the indictment alleged that Saldaña intentionally or knowingly caused the penetration of B.B.'s sexual organ with his finger. Count III alleged that Saldaña intentionally or knowingly engaged in sexual contact with B.B. by touching her anus with his finger or hand. Finally, Count IV alleged that Saldaña intentionally or knowingly caused the anus of B.A., a child younger than fourteen years of age, to contact Saldaña's mouth. The indictment also alleged two enhancement counts: (1) that prior to the commission of the offense, Saldaña was convicted of the felony offense of burglary of a building; and (2) that prior to the commission of the offense, Saldaña was convicted of the felony offense of delivery of a controlled substance.
The trial court appointed Dan Sanchez to represent Saldaña on March 19, 2003. The parties appeared for a pre-trial hearing on July 28, 2003. During the pre-trial hearing, Saldaña, through his attorney, asked the court to allow him to personally cross-examine witnesses if, during trial, he felt that his attorney was not asking the right questions. The trial court denied the request.
After that exchange, at the pre-trial hearing, the State moved to dismiss Count III of the indictment. The trial court accepted the dismissal. Sanchez then informed the trial court that Saldaña had elected to have the trial court, instead of the jury, assess punishment. The parties then selected a jury. At the beginning of trial the next day, the arraignment was read by the State, but the content does not appear in the record. Saldaña pleaded not guilty, and trial commenced.
The two complainants testified at trial. First, B.B. testified that she was nine years old at the time of trial and unmarried. She testified that her mother, Bridget, would leave B.B. and her sister, B.A., at a babysitter's trailer while she worked. The babysitter was identified as Jill Breedlove. B.B. identified Saldaña as Breedlove's boyfriend who was occasionally present at Breedlove's trailer when Breedlove babysat.
B.B. testified that on occasion, her mother would have to work late and that on those nights, B.B. and B.A. would stay the night at Breedlove's trailer. B.B. stated that on one particular night, she was laying on Breedlove's bed in the trailer when she was approached from behind by Saldaña. She testified that it was dark in the room, and she was facing away from the door to the bedroom. She testified that she turned around and saw Saldaña enter the room. He subsequently laid down on the bed next to her; her back was towards him. She said that Saldaña pulled down her panties, touched her from top to bottom of her "middle part ... where [she] pee[s] from" with his finger, and then he licked his finger. She testified that his finger stayed on the "outside." She testified that she rolled over, and Saldaña told *49 her to go back to sleep. After the incident, she got up from the bed and went into the living room where Breedlove and her sister were watching television. She did not discuss the events with Breedlove. She was eight years old at the time of the incident. She testified that Saldaña never touched her again.
B.B. testified that she told B.A. what happened. She testified that after some time she told her teacher about the events, but initially she did not specify which teacher. On cross-examination, she stated that she told two of her teachers, Mary Martinez and Hermila Gomez, although she did not recite exactly what she told each of them.
B.A. also testified. B.A. stated that she was eight years old at the time of trial and unmarried. She also identified Saldaña as Breedlove's boyfriend and that he was present at Breedlove's trailer while she and her sister were there. She testified that while at the trailer, Saldaña would kiss her on the lips and with his tongue. The State asked her to identify, on a drawing of the front and back sides of a child's body, where Saldaña had touched her. She circled the mouth, vagina, and buttocks.
B.A. testified that on one occasion, she was in either the living room or the bedroom in the trailer when Saldaña touched her. She testified that he touched her where you "poo out of." Immediately thereafter, the State asked whether she "could feel his tongue touch [her] body?" She answered, "Yes." She testified that this occurred more than once. On one occasion, after touching her, Saldaña presented her with a pocket knife and told her not to tell anyone what happened. The State then asked, "And when he touched you, you [sic] used his tongue?" She answered, "Yes."
Mary Anderson, a Harlingen police detective, testified about her investigation into the allegations against Saldaña and that her investigation was consistent with abuse of the two children. After Anderson's testimony, the jury was excused for a break. Saldaña, through his counsel, requested that the trial court recall all the witnesses so that he could ask some questions of his own. The trial court denied his request.
B.B.'s two teachers, Mary Martinez and Hermila Gomez, testified.[1] Martinez testified that B.B. asked to speak to her one day at school. The two went into the hallway, and B.B. began to tell her "what the babysitter had tried." Martinez stated that she did not question B.B. fully to get the whole story. Rather, Martinez asked B.B. if she would feel comfortable speaking to Gomez, and she then went and asked Gomez to join them. She stated that she felt that Gomez would be better able to handle the situation. Martinez testified that she did not stay in the hallway to listen to the entire conversation. Saldaña's counsel asked her whether she heard B.B. tell Gomez that Saldaña exposed himself to her. Martinez testified that she heard B.B. report to Gomez that "Jesse tried to show me or pull out his private part."
Hermila Gomez testified that in November 2002, Martinez came to her classroom and told her that B.B. had reported that a *50 man touched her private parts. Martinez had asked Gomez to speak with B.B. because Gomez served as an investigator for Child Protective Services for approximately ten years. Specifically, B.B. reported that her babysitter's boyfriend had touched her. The State questioned her about the specifics of the outcry:
Q. And what did she say happened?
A. She said she was laying down and that this man Jesse had sat by the edge of the bed and he had pulled her panties down.
Q. And what did she say that he did?
A. She said that he had stuck his finger inside her private parts and that he started licking his finger.
Q. Did she tell you anything else?
A. She said he had done this about five times and that she was pretending to be asleep. So after awhile she just rolled over on her side and she opened her eyes. So she said that the man thought she had woken up and he just told her to go back to sleep.
On cross-examination, Saldaña's counsel clarified that the "five times" had occurred on the same night. He also inquired as to whether B.B. reported that Saldaña exposed himself to her, to which she answered, "No."
Next, Deyanira Romero, an employee of the Cameron County Children's Advocacy Center at Maggie's House in San Benito, testified. Romero stated that she interviewed B.A. at Maggie's House. B.A. told her that Saldaña was her babysitter's boyfriend. She testified that B.A. reported that Saldaña had "licked her butt." The State then inquired into the specifics of the outcry:
Q. Okay. And when she said licked her butt, was she more specific about where?
A. Part of the questioning is, obviously, to make sure how that happened; and so, therefore, I asked her if it was over or under her clothes. Initially she said it was over her panties. Because we needed clarification to find out, because she kept insisting that it was in her butt, that he licked her in her butt, we wanted more specific clarification to be able to know that what she waswhat she was saying and how she was saying it. And so we used various tools during the interview process. I did use the diagrams with her. And these diagrams are gender appropriate. We used the female and the male. And she still was not clear. She kept insisting it was over her panties. So we also used anatomical dolls as tools for our interviewing practices. And so at that time, because she had made an outcry and she kept insisting that he had licked her in her butt, we brought out the dolls. I used the dolls and she demonstrated with the dolls how this had happened. And basically, she lowered the panties of this little doll just a little bit and then showed that her panties were indeed still on but they were lowered. And that's how she demonstrated that Jesse had licked her butt.
On cross-examination, Romero testified that B.A. did not say that her panties were lowered until after Romero had left the room to speak with someone and had returned to resume questioning. Romero testified that when she left the room, she discussed the interview with Detective Mary Anderson and a woman from child-care licensing, Miriam Luna. After she returned and continued questioning, B.A. finally stated that her panties had been lowered at the time Saldaña "licked her in *51 her butt." Saldaña's attorney suggested, through his questions, that Romero asked B.A. suggestive questions until B.A. finally stated that her panties were down. Saldaña's attorney asked whether children had ever lied to Romano during an interview, and she replied, "Yes."
The State rested. Saldaña's counsel called several witnesses who attempted to refute the idea that Saldaña was present at Breedlove's trailer during the time period when the two girls alleged the incidents occurred. Saldaña did not testify.
After the close of the evidence, the trial court held a charge conference, at which Saldaña's attorney lodged several objections. First, he objected to the inclusion of an instruction regarding the statute of limitations that also included the two girls' birth dates. He argued that by providing the girls' birth dates in the charge, the State was relieved of proving the girls' ages, which was an element of all the alleged offenses. The trial court overruled the objection.
Second, Saldaña's attorney reminded the trial court that the State had dismissed Count III of the indictment. He objected that the jury charge referenced three counts of the indictment as Counts I, II, and IV; thus, the jury could speculate about the dismissed count. He asked to have the jury charge renumbered and the indictment amended to reflect the dismissal of Count III of the indictment. The trial court amended the jury charge so that Count IV of the indictment became Count III of the jury charge. The trial court also agreed to amend the indictment. Apparently, however, the trial court never manually amended the indictment.
The jury found Saldaña guilty on all counts. Punishment was tried to the court, after which the trial court sentenced Saldaña to thirty-five years imprisonment for each count, with the sentences to run consecutively. This appeal ensued.

II. CHARGE ERROR
By his first issue, Saldaña complains that the jury charge's preliminary instructions included the complainants' birth dates, thereby relieving the State of its burden to prove the complainants' ages, an element of the charged crimes. See Tex. Penal Code Ann. §§ 21.11(a) ("A person commits an offense if, with a child younger than 17 years ..."), 22.021(a)(2)(B) ("A person commits an offense... if ... the victim is younger than 14 years of age ..."). The jury charge provided in the introductory paragraphs an instruction regarding the statute of limitations, which included the complainants' dates of birth:
You are instructed that the State is not bound by the specific date alleged in the indictment. The date of the offense as alleged is immaterial provided that the offense was committed prior to the filing of the indictment, in this case being January 22, 2003, and within the period of limitations, in this case being ten (10) years from the eighteenth (18th) birthday of the victim of the offense. You are further instructed that the birth date of B.B. is September 2, 1993 and the birth date of B.A. is October 5, 1994.
Saldaña objected to the jury charge, but the trial court overruled his objection.
The State counters that the application paragraphs of the jury charge, the portion of the charge upon which the jury is authorized to convict, required the State to prove the complainants' birthdays beyond a reasonable doubt. For example, the application paragraph for count II of the indictment stated
Now if you find from the evidence beyond a reasonable doubt that on or about the 15th day of April, 2002, in *52 Cameron County, Texas, the Defendant, JESUS PEREZ SALDAÑA, did then and there intentionally or knowingly cause the penetration of the female sexual organ of B.B., a child who was then and there younger than 14 years of age and not the spouse of the defendant, by the defendant's finger, then you will find the defendant guilty of Aggravated Sexual Assault of a Child as alleged in Count II of the indictment and next consider Count III.
Thus, the jury charge did not relieve the State of its burden to prove the complainants' ages. Nevertheless, even if it was error to include the dates of birth in the introductory paragraphs, the State argues that the error was harmless because the State proved the complainants' birth dates, and Saldaña did not contest the birth dates at trial.
Complaints of jury charge error are reviewed first for error, and second, for harm to warrant reversal. TEX.CODE CRIM. PROC. ANN. art 36.19 (Vernon 2006);[2]Almanza v. State, 686 S.W.2d 157, 174 (Tex.Crim.App.1985). A jury is only authorized to convict based on the charge's application paragraph. Glockzin v. State, 220 S.W.3d 140, 150 (Tex.App.-Waco 2007, pet. ref'd). As stated above, the application paragraphs did not reference the instruction on limitations, which included the complainants' birth dates, but rather, required the State to prove the dates of birth beyond a reasonable doubt. Accordingly, the jury charge did not relieve the State of its burden to prove that element of the crimes.[3] Moreover, any error would be harmless, given that the State proved the complainants' birth dates, which Saldaña did not contest at trial. Almanza, 686 S.W.2d at 171 (harmless error standard applies, and court must consider state of evidence and contested issues to determine harm); Glockzin, 220 S.W.3d at 153. We overrule Saldaña's first issue.

III. RIGHT TO SELF-REPRESENTATION
By his second and third issues, Saldaña argues that he was denied his constitutional right to represent himself. See U.S. CONST. amend. VI; TEX. CONST. art. 1, § 10; Faretta v. California, 422 U.S. 806, 834, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975); Funderburg v. State, 717 S.W.2d 637, 641-42 (Tex.Crim.App.1986). First, Saldaña admits in his brief that his pre-trial request was for hybrid representation-essentially, he wanted to be co-counsel with his appointed attorney. Nevertheless, he argues that his request to cross-examine witnesses "if he felt his counsel had not done the job he wanted done" was an unequivocal request for self-representation and that the trial court should have then conducted a Faretta hearing to determine if he voluntarily and intelligently chose self-representation. Saldaña argues that the trial court denied him the right to personalize his defense, requiring reversal of the conviction, and that the trial court's denial of his request was improperly based on Saldana's lack of legal training. Second, for the *53 same reasons, Saldaña asserts that the trial court denied his constitutional right to represent himself when he denied Saldaña's mid-trial request to cross-examine witnesses. We disagree.
The Sixth Amendment guarantees the right to conduct one's own defense, so long as the choice of self-representation is made intelligently, knowingly, and voluntarily. Faretta, 422 U.S. at 835, 95 S.Ct. 2525; DeGroot v. State, 24 S.W.3d 456, 457 (Tex.App.-Corpus Christi 2000, no pet.). "Although a defendant need not himself have the skill and experience of a lawyer in order competently and intelligently to choose self-representation, he should be made aware of the dangers and disadvantages of self-representation, so that the record will establish that `he knows what he is doing and his choice is made with eyes open.'" Faretta, 422 U.S. at 835, 95 S.Ct. 2525 (quoting Adams v. United States ex rel. McCann, 317 U.S. 269, 279, 63 S.Ct. 236, 87 L.Ed. 268 (1942)). The right to self-representation does not attach until the defendant "clearly and unequivocally asserts it." DeGroot, 24 S.W.3d at 457 (citing Faretta, 422 U.S. at 835-36, 95 S.Ct. 2525); see Scarbrough v. State, 777 S.W.2d 83, 92 (Tex.Crim.App. 1989) (citing Funderburg, 717 S.W.2d at 642).
To the contrary, it is well established that there is no absolute right, under the federal or state constitution, to hybrid representation. See Scarbrough, 777 S.W.2d at 92 (citing McKaskle v. Wiggins, 465 U.S. 168, 183, 104 S.Ct. 944, 79 L.Ed.2d 122 (1984); Landers v. State, 550 S.W.2d 272, 278 (Tex.Crim.App. 1977) ("This Court has consistently interpreted Article 1, Section 10, supra, to allow an accused and his counsel to be heard at trial in appropriate situations, but not to expand or alter the right to counsel or in any way give the accused the right to hybrid representation.")).[4] Although a defendant has no absolute right to hybrid representation, a trial court has discretion to allow it. Id. ("[A] trial court may certainly permit hybrid representation in its discretion.").
In this case, the trial court refused to allow hybrid representation. At the pretrial hearing, the following exchange occurred:
Sanchez: Okay. That's all I have for the Court. Excuse me. Judge, my client also has asked me to ask the Court that during the trial, when I'm cross-examining witnesses, if he feels that I'm not asking the proper questions or feels that there's other questions he wants asked, he wants permission from this Court to take over and do some cross-examination of his own as a pro se litigant.
The Court: Well, Mr. Saldaña, theyou are represented by Mr. Sanchez, who is a very competent lawyer. And
The Defendant: Yes.
The Court: Listen me [sic].
The Defendant: Okay.
The Court: And the reason that the Court appointed Mr. Sanchez is because you are not trained as a lawyer and you don't understand the procedure and you don't understand the overall scope of what has to happen in a trial. That's why the Court appointed Mr. Sanchez, okay? That's for *54 your best interests. Okay. That's what we're trying to do here is protect your interests.
The Defendant: Yes, sir.
The Court: Now, you have opted, based on what's been represented to the Court, to go ahead and go forward with a trial in this case, and we're going to select a jury in this case this afternoon.
The Defendant: Okay, yes, sir.
The Court: And we're going to begin the evidence tomorrow morning in this case, all right? Now, but as far as the Court is concerned, Mr. Sanchez is your lawyer. If you have something you want to suggest to Mr. Sanchez, then you can either write him a little note or you can whisper in his ear; but he is the one that's going to be in charge of your case in trying this case, okay? And the reason we are doing that is because that's in your best interest is to protect you. Remember that the purpose of a trial is to determine your guilt or innocence. That's the purpose. Nobody is saying you are guilty.
The Defendant: Okay.
The Court: The purpose is for those 12 people that are going to be selected this afternoon to determine at the end of the trial of all the evidence whether they are going to find you guilty or not guilty.
The Defendant: Yes, I understand that.
The Court: That's the purposes [sic]. That's his job is to make sure that your rights are protected, to make sure that he does everything to protect your interests throughout the course of the trial. And if you feel like any other person that comes here before the Court and has a lawyer, that the lawyer needs to follow up on something, you make a suggestion to him. He'll be the one doing the questioning.
The Defendant: Okay.
The Court: Okay?
The Defendant: Thank you.
The Court: Thank you.
Saldaña argues that although he requested hybrid representation prior to trial, that request constituted an unequivocal assertion of the right to self-representation, and the trial court erroneously denied his right to self-representation by relying on his lack of legal training. We disagree.
In Scarbrough v. State, the Texas Court of Criminal Appeals addressed a situation where the defendant initially clearly and unequivocally asserted his right to self-representation. Id. at 93. The trial court offered the defendant standby counsel, to which the defendant was receptive. Id. The trial court ultimately decided not to allow the defendant to represent himself either alone or with standby counsel. Id. at 89. The court of appeals held that "a defendant may forfeit his right to self-representation by taking vascillating positions on the issue." Id. at 92. The court of criminal appeals, however, held that a request for standby counsel made after an unequivocal assertion of the right to self-representation is not necessarily inconsistent with the right to self-representation; thus, the defendant could not be said to have vascillated. Id. at 93. Accordingly, the court held that the trial court violated Scarbrough's Sixth Amendment right to self-representation and reversed the conviction. Id. at 94.
We find that Scarbrough is distinguishable. In Scarbrough, the defendant first unequivocally asserted his right to self-representation and only accepted standby counsel after the trial court offered it. Id. at 93 ("While clearly willing to accept aid of standby counsel, appellant thus displayed *55 an unwavering desire to conduct his own defense, for better or worse."). In this case, however, prior to trial Saldaña never asked to be allowed to control his own defense on his own. Rather, Saldaña requested that trial counsel continue his defense and that he be allowed to ask some questions if he felt that trial counsel was not adequately questioning the witness. This is merely a request to serve as co-counsel with the defense lawyer; it is not an unequivocal request for self-representation sufficient to require the trial court to conduct a Faretta hearing. See United States v. Treff, 924 F.2d 975, 979 n. 6 (10th Cir.1991); Cross v. United States, 893 F.2d 1287, 1291-92 (11th Cir.1990); United States v. Tarantino, 846 F.2d 1384, 1420 (D.C.Cir.1988).[5] Saldaña never indicated he wanted to represent himself by himself.
The trial court commented on Saldana's inability to adequately preserve his own rights, which would have been an inappropriate reason to deny a request for self-representation had a proper request for self-representation been made. See Faretta, 422 U.S. at 835, 95 S.Ct. 2525. Nevertheless, here, the trial court was not required to hold a Faretta hearing and did not deny Saldaña's constitutional right to self-representation because Saldana's initial request to cross-examine witnesses was not an unequivocal assertion of the right to self-representation.
Saldaña's second request during trial to cross-examine witnesses suffers from the same infirmity. In mid-trial, outside the presence of the jury, the following exchange occurred:
Mr. Dan Sanchez: Judge, I think my client would like to address the Court.
The Defendant: I changed my mind, Your Honor.
The Court: Very well.
Mr. Dan Sanchez: You're sure?
The Defendant: No.
Mr. Dan Sanchez: Well, let me just put it on the record, Judge. My client again has asked me to inform the Court, and I told him he should inform the Court, but he wants to continue the trial pro se with me assisting him. He feels I'm not doing an adequate job and that he knows his case better than I do, and he wants to take over.
The Court: Is that your feeling, Mr. Saldaña?
The Defendant: Yes, sir, if they can bring back the witnesses. Recall them, because I would like to ask my own questions on that because
The Court: Let me remind you of what I told you at the beginning of the trial before we started, when you first made a request that you wanted to *56 ask some questions yourself. At that time I think I told you that the Court had appointed somebody that was qualified to represent your interest. And the Court only appoints qualified attorneys. And the Court appoints three attorneys in this court, and they are all very qualified people, number one. Number two, you are not trained.
The Defendant: Just simple questions.
The Court: Listen to me. You're not trained. Number three, I know that sometimes in the jailhouse you have a lot of jailhouse lawyers. Listen to me. They have a lot of jailhouse lawyers. They have all kinds of advice for you; but it's in your best interest that you let this man continue directing all the questions. And he'll doyou've seen him where he objects. He'll do what he is supposed to do. So at this time I'm going to deny your request and I'm going to let the trial continue.
Saldaña's counsel informed the court that Saldaña wanted to "take over" but also indicated that Saldaña preferred to have his counsel assist him throughout the remainder of the trial. Again, this is not an unequivocal request for self-representation. Nowhere in the record is there any indication that Saldaña wanted to conduct the trial on his own. Accordingly, we overrule Saldaña's issues two and three.

IV. DOUBLE JEOPARDY VIOLATIONS
In his eighth issue, Saldaña argues that we should vacate his conviction under Count I of the indictment because punishment for the acts alleged in Count I violates the Double Jeopardy Clause of the Fifth Amendment to the United States Constitution. U.S. CONST. amend. V. Specifically, Saldaña complains that the evidence supporting Counts I and II of the indictment constituted one sequence and course of eventsi.e. the allegation that he touched B.B.'s vagina with his finger (Count Iindecency with a child) is subsumed within the allegation that he penetrated B.B.'s vagina with his finger (Count IIaggravated sexual assault) because the touching occurred in the process of the penetration. The only difference between these two counts, he argues, is completion of the aggravated sexual assault alleged in Count II. The trial court assessed thirty-five years imprisonment for Count I and also assessed thirty-five years imprisonment for Count II, to run consecutively. Thus, he argues he is being punished twice for the same offense.
In contrast, the State points out that Saldaña's counsel did not object in the trial court on this ground. It argues that, therefore, the double jeopardy violation must be apparent on the face of the record. The State argues that the outcry witness, Hermila Gomez, testified that Saldaña touched B.B.'s vagina with his finger five times on the same night and also penetrated her vagina with his finger that same night. The State argues that these acts are separate, and because there were valid theories for the multiple convictions, there is no double jeopardy violation on the face of the record.
Although Saldaña did not object to a double jeopardy violation at trial, and in most cases such failure would waive the error, a double jeopardy claim may be raised for the first time on appeal when the "undisputed facts show the double jeopardy violation is clearly apparent on the face of the record and when enforcement of usual rules of procedural default serves no legitimate state interests." Gonzalez v. State, 8 S.W.3d 640, 643 (Tex. Crim.App.2000); Shaffer v. State, 477 S.W.2d 873, 876-77 (Tex.Crim.App.1971). In this case, Saldaña was tried for both aggravated sexual assault of a child and *57 for indecency with a child in the same proceeding. Thus, the trial court knew or should have known of a potential double jeopardy issue. Saenz v. State, 131 S.W.3d 43, 50 (Tex.App.-San Antonio 2003), aff'd, 166 S.W.3d 270 (Tex.Crim. App.2005). Additionally, enforcement of the usual rules of procedural default would serve no legitimate state interests, given that if we find an actual double jeopardy violation, a retrial would not be required. Id. Rather, the judgment of conviction would merely be reformed to delete the duplicated punishment. Id. Accordingly, we will review the record to determine if a double jeopardy violation occurred.
"The Fifth Amendment guarantee against double jeopardy embodies three protections: against a second prosecution for the same offense following conviction, against a second prosecution for the same offense following acquittal, and against multiple punishments for the same offense." Hutchins v. State, 992 S.W.2d 629, 631 (Tex.App.-Austin 1999, pet. ref'd, untimely filed). In this case, Saldaña argues that his convictions violated the third principle: he is being punished twice for the same offense. "When the same conduct violates different criminal statutes, the two offenses are the same for double jeopardy purposes if one of the offenses contains all the elements of the other." Belt v. State, 227 S.W.3d 339, 344 (Tex. App.-Texarkana 2007, no pet.). For example, "greater inclusive and lesser included offenses are the same for jeopardy purposes." Parrish v. State, 869 S.W.2d 352, 354 (Tex.Crim.App. 1994).
Texas courts have recognized that when the same conduct is used to support a conviction for indecency with a child and for aggravated sexual assault, the defendant may be subject to multiple punishments in violation of the Fifth Amendment to the United States constitution, depending on the facts of the case. Ochoa v. State, 982 S.W.2d 904, 908 (Tex.Crim.App. 1998); Hutchins, 992 S.W.2d at 632; also Vick v. State, 991 S.W.2d 830, 834 n. 2 (Tex.Crim.App.1999). Although a person "who commits more than one discrete sexual assault against the same complainant may be convicted and punished for each separate act, even if the acts were committed in close temporal proximity," the penal statutes do not allow "stop-action" prosecutions. Barnes v. State, 165 S.W.3d 75, 87 (Tex.App.-Austin 2005, no pet.). In other words, "a conviction for a completed sexual assault bars conviction for conduct that is demonstrably part of the commission of that offense." Id. For example, "penile contact with [the] mouth, genitals, or anus in the course of penile penetration will be subsumed." Patterson v. State, 152 S.W.3d 88, 92 (Tex.Crim.App.2004).
The Texas Court of Criminal Appeals has explained:
It is clear that sexual exploitation of children is of great concern to the legislature. The offenses enumerated by the legislature cover a range of deviant sexual conduct, beginning with exposure and continuing through sexual contact to penetration and including incest and child prostitution. The scheme encompasses escalation of abuse; no matter where in the range the perpetrator stops, the offense is complete at that point. That is not to say that every offense in the range can in all cases be prosecuted as a separate offense. While it is clear from the plain language of the various statutes that the legislature intended harsh penalties for sexual abuse of children, there is nothing in the language to suggest that it intended to authorize "stop-action" prosecution. Just as a conviction for a completed offense bars prosecution for an attempt to commit the same offense, a conviction *58 for an offense set out in § 3.03 [of the Texas Penal Code] bars conviction for conduct that, on the facts of the case, is demonstrably part of the commission of the greater offense. For example, indecency by genital exposure of oneself in the course of manual penetration of another are separate offenses, while penile contact with mouth, genitals, or anus in the course of penile penetration will be subsumed.
Patterson, 152 S.W.3d at 91-92.
In Belt v. State, the defendant was convicted of indecency with a child for contacting the complainant's anus with his penis and for penetrating the complainant's anus with his penis. 227 S.W.3d at 344. The evidence used to convict the defendant for the indecency count was precisely the same as that relied upon for the penetration conviction: "there is no evidence that Belt touched part of J.Y.'s anus except by his penis." Id. Accordingly, the court of appeals held that the record demonstrated that the defendant had been punished twice for the same conduct. Id. at 344-45.
Here, the record demonstrates that the aggravated sexual assault by penetration of B.B.'s vagina was based on the same conduct as the alleged indecency with a child by contact. Specifically, B.B. testified that on one occasion on a single night, Saldaña touched her vagina with his finger. She said that Saldaña pulled down her panties, touched her from top to bottom of her "middle part ... where [she] pee[s] from" with his finger, and then he licked his finger. She testified that his finger stayed on the "outside." Although Gomez testified that B.B. reported that Saldaña touched her five times that night and penetrated her vagina that same night, there is no indication that these "five times" occurred after separate time intervals or with other activity in between. In fact, the testimony suggests the opposite: that Saldaña entered the room, touched B.B.'s vagina and penetrated it in the same course of action, licked his finger, and then B.B. left the room. On this record, we hold that Saldaña was punished twice for the same offense: touching B.B.'s vagina with his finger in the course of penetrating B.B.'s vagina with his finger. See id. Accordingly, we reform the judgment to delete the conviction for the offense carrying the less severe punishment which in this case is the conviction for Count I of the indictment for indecency with a child by contact.

V. LEGAL AND FACTUAL SUFFICIENCY CHALLENGES
Saldaña raises legal and factual sufficiency challenges to several of the elements of the charged offenses. Specifically, Saldaña asserts that the evidence was legally and factually insufficient to support the findings: (1) that the touching of B.B.'s vagina, that is the subject of Count I of the indictment, was made with the intent to arouse or gratify the sexual desire of any person; (2) that Saldaña knowingly and intentionally caused the penetration of B.B.'s vagina, as alleged in Count II of the indictment; and (3) that Saldaña knowingly and intentionally caused his mouth to contact B.A.'s anus, as alleged in Count IV of the indictment.

A. Legal and factual sufficiency standards of review
To assess the legal sufficiency of the evidence to support a conviction, we must consider all the evidence in the light most favorable to the verdict and determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt based on that evidence and the reasonable inferences therefrom. Jackson v. Virginia, *59 443 U.S. 307, 318-19, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); Clayton v. State, 235 S.W.3d 772, 778 (Tex.Crim.App.2007); Hooper v. State, 214 S.W.3d 9, 13 (Tex. Crim.App.2007). We must give deference to "`the responsibility of the trier of fact to fairly resolve conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts.'" Hooper, 214 S.W.3d at 13 (quoting Jackson, 443 U.S. at 318-19, 99 S.Ct. 2781).
In contrast, in a factual-sufficiency review, we must review the evidence in a neutral light rather than in the light most favorable to the verdict. Roberts v. State, 220 S.W.3d 521, 524 (Tex. Crim.App.2007), cert. denied, ___ U.S. ___, 128 S.Ct. 282, 169 L.Ed.2d 206 (2007); Watson v. State, 204 S.W.3d 404, 414 (Tex.Crim.App.2006); Johnson v. State, 23 S.W.3d 1, 7 (Tex.Crim.App.2000). The evidence is factually insufficient when either "the evidence supporting the verdict is so weak that the verdict seems clearly wrong and manifestly unjust" or "the supporting evidence is outweighed by the great weight and preponderance of the contrary evidence so as to render the verdict clearly wrong and manifestly unjust." Roberts, 220 S.W.3d at 524; Watson, 204 S.W.3d at 414-15; Johnson, 23 S.W.3d at 11. Although we have the ability to second-guess the jury to a limited extent, our review should nevertheless be deferential, "with a high level of skepticism about the jury's verdict required before a reversal can occur." Roberts, 220 S.W.3d at 524; Watson, 204 S.W.3d at 417.

B. Evidence of intent to arouse or gratify sexual desire (Count I of the indictment)
In Count I of the indictment, Saldaña was charged with committing indecency with a child by contact, in violation of Texas Penal Code section 21.11(a)(1). TEX. PENAL CODE ANN. § 21.11(a)(1). Because we have vacated Saldaña's conviction under this Count, it is unnecessary to consider his arguments under issue four with regard to the legal and factual sufficiency of the evidence supporting that conviction. See TEX.R.APP. P. 47.1. Accordingly, we overrule Saldaña's fourth issue.

C. Evidence of vaginal penetration (Count II of the indictment)
In his fifth issue, Saldaña challenges the legal and factual sufficiency of the evidence supporting Count II of the indictment, wherein the State alleged that Saldaña intentionally or knowingly caused the penetration of B.B.'s sexual organ. See TEX. PENAL CODE ANN. § 22.021(a)(1)(B)(i). Saldaña argues that B.B. expressly denied that Saldaña penetrated her vagina; therefore, the only evidence of penetration comes from outcry testimony.[6] Saldaña argues that after Crawford v. Washington, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004) and Davis v. Washington, 547 U.S. 813, 126 S.Ct. 2266, 165 L.Ed.2d 224 (2006), outcry testimony alone cannot provide a "substantive basis for imposing culpability when it fails after confrontation." In other words, Saldaña asks if the complainant testifies at trial in such a manner that contradicts her previous outcry testimony, does the outcry *60 testimony still remain probative evidence of guilt?
Neither Crawford nor Davis, however, support Saldaña's argument. Both cases were decided under the Confrontation Clause of the United States Constitution, and they discuss the circumstances under which that clause is violatedthe Confrontation Clause is violated when testimonial statements are admitted into evidence when the declarant is unavailable and where there is no prior opportunity to cross-examine. Davis, 126 S.Ct. at 2273; Crawford, 541 U.S. at 68, 124 S.Ct. 1354. Neither case discusses the substantive value of out-of-court testimonial statements that are admitted into evidence where there is an opportunity to cross-examine the declarant, as there was here. In fact, Crawford notes in a footnote that "when the declarant appears for cross-examination at trial, the Confrontation Clause places no constraints at all on the use of his prior testimonial statements." Crawford, 541 U.S. at 59 n. 9, 124 S.Ct. 1354.[7] Thus, Crawford actually suggests the opposite of Saldaña's position. Saldaña cites no subsequent case that interprets these cases in the manner he suggests.
On the contrary, it is well established that outcry testimony is substantive evidence of guilt that is sufficient to support a conviction beyond a reasonable doubt. See Rodriguez v. State, 819 S.W.2d 871, 873 (Tex.Crim.App.1991). Furthermore, when a witness recants prior testimony, it is up to the fact finder to determine whether to believe the original statement or the recantation. Chambers v. State, 805 S.W.2d 459, 461 (Tex.Crim. App.1991). A fact finder is fully entitled to disbelieve a witness's recantation. Id.[8]
The outcry testimony here was sufficient to sustain Saldaña's conviction, and the jury was entitled to disbelieve B.B.'s inconsistent testimony at trial that Saldaña did not penetrate her sexual organ. Accordingly, we refuse to hold that the outcry testimony in this case cannot support the judgment for conviction merely because B.B. denied penetration at trial. The jury was entitled to disbelieve this recantation of her previously given outcry statement. Finding no merit to Saldaña's argument, we overrule issue five.

D. Evidence of anal contact
By issue six, Saldaña argues that there is legally and factually insufficient evidence to support his conviction under Count IV of the indictment (Count III of the jury charge). In that count, the State alleged that Saldaña intentionally or knowingly caused the anus of B.A. to contact Saldaña's mouth. See TEX. PENAL CODE ANN. § 22.021(a)(1)(B)(iv).
Saldaña essentially argues that the evidence is legally and factually insufficient to support the finding that he caused his mouth to contact B.A.'s anus because the word "anus" was never used during the testimony. B.A. testified that Saldaña had touched her where she "peed" and "pood." She also circled the central buttocks area *61 in a drawing. Romero, the witness who testified as to B.A.'s outcry, testified that B.A. stated that Saldaña had "licked her in her butt." Saldaña argues that, although a child is not required to testify as precisely as an adult, the testimony must still be understood to meet the definition of anus, which Saldaña defines as the "posterior opening of the alimentary canalthus excluding the buttocks." Appellant's Brief at 38 (citing Wright v. State, 693 S.W.2d 734, 735 (Tex.App.-Dallas 1985, pet. ref'd) (reversing conviction for defective indictment that alleged mere touching of the buttocks, not the anus)). He argues that the testimony merely shows that Saldaña may have licked B.A.'s buttocks, not her anus, as required for a conviction.
We disagree that B.A.'s testimony and that of the outcry witness were too imprecise to support a conviction under Texas Penal Code section 22.021(a)(1)(B)(iv). We have previously held that evidence showing penetration of the complainant's "butt" was legally sufficient to sustain a conviction for penetration of the "anus." See Ozuna v. State, 199 S.W.3d 601, 609 (Tex. App.-Corpus Christi 2006, no pet.). Other courts have likewise allowed juries to infer that a child's reference to an act performed "in the butt" or the place where the child goes to the bathroom is sufficient to identify the anus. Mallet v. State, 9 S.W.3d 856, 864 (Tex.App.-Fort Worth 2000, no pet.) ("[T]he jury could reasonably infer that K.A.'s reference to `butt' or `backside where she goes to the bathroom' was a reference to her anus."); see also Martinez v. State, Nos. 14-03-00596-CR & 14-03-00597-CR, 2004 WL 1153682, at *2, 2004 Tex.App. LEXIS 4649, at *4 (Tex. App.-Houston [14th Dist.] May 25, 2004, pet. ref'd) (mem.op.) ("The jury could have rationally concluded that `in my butt' indicated penetration of the anus."). Accordingly, we find that the outcry testimony was sufficient to establish contact with the anus. Saldaña's sixth issue is overruled.

VI. INEFFECTIVE ASSISTANCE OF COUNSEL
In his seventh issue, Saldaña argues that he received ineffective assistance of counsel based on his trial counsel's failure to raise various objections to the testimony of Martinez, Gomez, and Romero as outcry witnesses. Saldaña argues that but for the erroneous admission of the outcry testimony, he would not have been convicted. We disagree.

A. Strickland test
This Court utilizes the two-pronged Strickland test to determine whether counsel's representation was so deficient that it violated a defendant's Sixth Amendment right to counsel. Goodspeed v. State, 187 S.W.3d 390, 392 (Tex.Crim.App.2005); Jaynes v. State, 216 S.W.3d 839, 851 (Tex. App.-Corpus Christi 2006, no pet.); see Strickland v. Washington, 466 U.S. 668, 684, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Under that test, appellant must establish that "(1) his attorney's representation fell below an objective standard of reasonableness, and (2) there is a reasonable probability that, but for his attorney's errors, the result of the proceeding would have been different." Jaynes, 216 S.W.3d at 851; see Strickland, 466 U.S. at 687, 104 S.Ct. 2052.
Our review is necessarily deferentialan appellant "must overcome the strong presumption that counsel's conduct fell within the wide range of reasonable professional assistance." Jaynes, 216 S.W.3d at 851. The appellant bears the burden of proving both elements of an ineffective assistance claim by a preponderance of the evidence. Munoz v. State, 24 S.W.3d 427, 434 (Tex.App.-Corpus Christi 2000, no pet.).
*62 The acts or omissions complained of must appear on the record. Id. The Texas Court of Criminal Appeals has observed that in most cases on direct appeal, a silent record providing no explanation for counsel's conduct will be insufficient to overcome the presumption of reasonableness. Goodspeed, 187 S.W.3d at 392. It is "critical that the defendant obtain the necessary record in the trial court to rebut the Strickland presumption that counsel's conduct was strategic." Batiste v. State, 217 S.W.3d 74, 83 (Tex.App.-Houston [1st Dist.] 2006, no pet.); Green v. State, 191 S.W.3d 888, 894-95 (Tex.App.-Houston [14th Dist.] 2006, pet. ref'd).
An appropriate recordincluding counsel's reasons for his actions is usually prepared at a hearing on a motion for new trial or developed by a writ of habeas corpus. Id. "`[T]rial counsel should ordinarily be afforded an opportunity to explain his actions before being denounced as ineffective.'" Goodspeed, 187 S.W.3d at 392 (quoting Rylander v. State, 101 S.W.3d 107, 111 (Tex.Crim.App.2003)). Absent an opportunity for the attorney to explain his actions, an appellate court should not "find deficient performance unless the challenged conduct was `so outrageous that no competent attorney would have engaged in it.'" Goodspeed, 187 S.W.3d at 392 (quoting Garcia v. State, 57 S.W.3d 436, 440 (Tex.Crim.App.2001)).

B. Failure to object to the testimony of Martinez and Gomez
Saldaña argues that his trial counsel failed to object to the testimony of Martinez and Gomez on the grounds that the State did not give notice as required by Texas Code of Criminal Procedure article 38.072 or hold a hearing to determine reliability. TEX.CODE CRIM. PROC. ANN. art. 38.072 (Vernon 2005).[9] According to Saldaña, the State gave notice only of its intent to call Romero as an outcry witness.
On this record, we cannot conclude that the failure to object was not trial strategy. Although Saldaña filed a motion for new trial, there is no affidavit from his trial counsel explaining his actions. Furthermore, Saldaña does not cite any evidence in the record demonstrating counsel's reasons for failing to object to lack of notice. In the absence of direct evidence of counsel's motives, courts will presume a trial strategy if one can be imagined. Josey v. State, 97 S.W.3d 687, 696-97 (Tex.App.-Texarkana 2003, no pet.); Cates v. State, 72 S.W.3d 681, 699-700 (Tex.App.-Tyler 2001, no pet.). Several courts have held that the failure to object to outcry testimony could be a plausible trial strategy. Hankey v. State, 231 S.W.3d 54, 59-60 (Tex.App.-Texarkana 2007, no pet.); Josey, 97 S.W.3d at 696-97.
The record reflects that Saldaña's counsel did not seem at all surprised when *63 these women testified and even specifically referred to Gomez as the "outcry" witness. In fact, Martinez did not repeat any specific report of the incidents until Saldaña's counsel elicited her testimony on cross-examination. Saldaña's trial counsel then elicited specific testimony about the outcries to Martinez and Gomez in an attempt to show inconsistencies and discredit their testimony. While Saldaña's counsel questioned Martinez, the following exchange occurred:
Q. Okay. So if Ms. Gomez said that [B.B.] never told her anything about [Saldaña exposing himself], Ms. Gomez would be mistaken, or would you be mistaken about this?
A. About the time when it happened?
Q. About saying that.
A. Well, this is what B.B. told me. I don't know if Ms. Gomez
Q. Because Ms. Gomez says she didn't tell her anything about that.
A. Oh, well.
Q. So is she right or are you right?
A. Gosh, I don'tI heard that part. Now, I don't know if Ms. Gomez wasn't listening, because I know B.B. was crying, but
Q. So one of you is wrong, correct?
A. Probably.
In fact, in his closing statement, trial counsel again referred to the "outcry witness," presumably Gomez, who "said that [B.B.] told her he touched her five times. [B.B.] said only once." Thus, Saldaña's counsel also attempted to use the outcry testimony to discredit the complainant's testimony at trial. Pointing out inconsistencies in testimony in attempt to discredit the State's main witnesses is certainly a plausible trial strategy. Hankey, 231 S.W.3d at 59-60 (holding that appellant failed to satisfy first prong of Strickland test because record showed trial counsel used inadmissible outcry testimony to discredit the complainant's testimony); Josey, 97 S.W.3d at 696-97. On this record, we find that Saldaña has failed to establish that he received ineffective assistance of counsel.

C. Failure to object to Romero's testimony
Second, Saldaña argues that the notice provided regarding Romero's testimony was insufficient. Saldaña argues that the notice related only to Count III of the indictment, which alleged that Saldaña intentionally or knowingly engaged in sexual contact with B.B. by touching her anus with his finger or hand. Because that Count was dismissed, Saldaña argues that the notice was ineffective to allow Romero to testify as to any of the other alleged offenses, and trial counsel should have objected on that ground. Additionally, Saldaña argues that trial counsel should have requested a hearing to determine the reliability of her testimony.
On July 14, 2003, the State gave notice of its intent to use an outcry statement made to outcry witness Romero. The notice stated: "Ms. Romero, will testify that the victim, [B.A.][10], told her that the defendant, Jesus Saldaña, touched her private parts, that he would lower her panties and used his tongue to lick her insider [sic] her buttocks." This notice clearly related to Count IV of the indictment, which was not dismissed, and it was sufficient to allow Romero to testify as to that count. Counsel is not deficient for failing to take action that is without legal *64 basis. Oliva v. State, 942 S.W.2d 727, 732 (Tex.App.-Houston [14th Dist.] 1997, pet. dism'd). Because an objection to Romero's testimony could not have properly been sustained, counsel's failure to object was not ineffective assistance of counsel. Bradshaw v. State, 65 S.W.3d 232, 240 (Tex.App.-Waco 2001, no pet.). Accordingly, we reject Saldaña's argument that the notice was insufficient.
Furthermore, we cannot say on this record that trial counsel's failure to object and to request a hearing on reliability was not trial strategy. Saldaña's trial counsel questioned Romero extensively about the progress of her interview with B.A. B.A. reported to Romero that Saldaña "licked her in her butt." B.A. nevertheless told Romero that the contact was through her clothing. Trial counsel pressed further. Romero then admitted that after B.A.'s inconsistent response, Romero left the room to consult with investigators and then returned to the room to press B.A. further. Saldaña's trial counsel argued at trial that Romero manipulated the situation to get an accusation from B.A. that would constitute a criminal offense, and he also argued that Romero's interview caused B.A. to change her story. This is certainly a plausible trial strategy. Josey, 97 S.W.3d at 696-97. It just did not work this time. Hankey, 231 S.W.3d at 60 ("While a tactical decision to not object to the admission of evidence that is otherwise inadmissible (when that evidence might also be used to point out inconsistencies in the victim's story and might be used to demonstrate that various witnesses and police agencies do not themselves believe the victim's story) might not have proven to be a successful trial strategy in this particular case, we cannot say such a strategy is either unreasonable or patently ineffective."). Accordingly, we do not find that Saldana's counsel was ineffective for failing to object to Romero's testimony.

D. Confrontation clause objections
Finally, Saldaña argues that trial counsel failed to make Crawford-Davis objections, referencing his arguments under his fifth issue. As we stated above, however, the Sixth Amendment was not violated in any way here because both of the complainants were present in court and available for cross-examination. Davis, 126 S.Ct. at 2272-74; Crawford, 541 U.S. at 68, 124 S.Ct. 1354. Counsel was, therefore, not deficient in this regard. Oliva v. State, 942 S.W.2d at 732. Saldaña's seventh issue is overruled.

VII. VARIANCE BETWEEN THE INDICTMENT AND THE JURY CHARGE
In his ninth and final issue, Saldaña complains of a variance between the jury charge and judgment of conviction and the indictment. Saldaña was indicted on four counts: Count I (indecency with a child by contact), Count II (aggravated sexual assault of a child), Count III (indecency with a child by contact), and Count IV (aggravated sexual assault of a child). Before trial, the State moved to dismiss Count III of the indictment. Saldaña's trial counsel requested that jury charge be numbered in such a way that the jury not be able to surmise about the dismissed count. He further requested that the indictment be amended to reflect the dismissal. The trial court renumbered the jury charge and agreed to amend the indictment, but apparently, the indictment was never formally amended. Thus, in the jury charge, Counts I and II were exactly as stated in the indictment. However, Count IV of the indictment was renumbered as Count III of the charge, and the judgment of conviction also reflects this renumbering. Saldaña argues that reading *65 the judgment of conviction in conjunction with the unamended indictment, it appears that he was convicted for a dismissed count of the indictment.
The State, on the contrary, argues that it was Saldaña that requested the renumbering of the counts in the jury charge so that the jury would not speculate that there were other charges against him. It argues that Saldaña should be estopped from complaining about the error in the jury charge because he invited the error, citing Prystash v. State, 3 S.W.3d 522, 531 (Tex.Crim.App.1999) (en banc). Additionally, the State argues that the only variance that could result in reversal of a conviction is that between the charging instrument and the proof at trial. Gollihar v. State, 46 S.W.3d 243, 246 (Tex.Crim. App.2001). And in that circumstance, a material variance is only fatal if it operated to the defendant's surprise or prejudiced his rights. Id. at 248.
At the outset, we note that this case does not fit neatly within the invited error doctrine. Saldaña asked the trial court to amend the indictment, and the trial court agreed to do so. The trial court, however, never did. Thus, the error Saldaña complains of is not that which Saldaña invitedit is the trial court's failure to follow through with its own ruling. However, we disagree that the difference between the indictment and the jury charge operated as a surprise to Saldaña or prejudiced his rights.
Neither party cites, nor have we located, a case that addresses this precise issue. It is not clear from the record that the indictment was read to the jury at the beginning of the proceedings and that they were apprised of the dismissed count. The jury charge itself makes no mention of the dismissed count. On this record, without any explanation of how Saldaña was harmed by the trial court's failure to amend the indictment, we refuse to reverse on this ground. We overrule Saldaña's ninth issue.

VIII. CONCLUSION
Because we conclude that the conviction under Count I for indecency with a child by contact violates the Double Jeopardy Clause of the Fifth Amendment, we vacate the conviction for Count I of the indictment and reform the trial court's judgment of conviction to reflect our decision. In all other respects, we affirm.
NOTES
[1] Hermila Gomez was called to the stand first. After she indicated that B.B. initially spoke to Mary Martinez, Saldaña's counsel made a general objection, and a conversation off the record occurred. Gomez was excused so that Martinez could be called first. Gomez was then called back to the stand. When Gomez finished testifying, Martinez was called back to the stand for further questioning. For the sake of simplicity, the testimony is summarized here without indication of the order of the testimony.
[2] "Whenever it appears by the record in any criminal action upon appeal that any requirement of Articles 36.14, 36.15, 36.16, 36.17 and 36.18 has been disregarded, the judgment shall not be reversed unless the error appearing from the record was calculated to injure the rights of defendant, or unless it appears from the record that the defendant has not had a fair and impartial trial. All objections to the charge and to the refusal of special charges shall be made at the time of the trial." TEX.CODE CRIM. PROC. ANN. art. 36.19 (Vernon 2006).
[3] We previously held as much, albeit in an unpublished decision. Koole v. State, No. 13-06-026-CR, 2007 WL 2409815, at *1, 2007 Tex.App. LEXIS 2409815, at *3 (Tex.App.-Corpus Christi Aug.24, 2007, no pet.) (mem. op.) (not designated for publication).
[4] Nevertheless, Saldaña argues that Article I, section 10 of the Texas Constitution guarantees the right to hybrid representation. That provision states that a defendant "shall have the right of being heard by himself or counsel, or both." Tex. Const. art. I, § 10. However, the Texas Court of Criminal Appeals has expressly held that this provision does not provide a constitutional right to hybrid representation. Landers v. State, 550 S.W.2d 272, 278 (Tex.Crim.App.1977). We are not at liberty to disregard this express holding.
[5] Although not precedential, several unpublished courts of appeals decisions have held that a defendant's request to serve as co-counsel with his trial counsel is not an unequivocal assertion of the right to self-representation requiring a Faretta hearing. See Glover v. State, No. 14-03-00763-CR, 2004 WL 1192822, at *2, 2004 Tex.App. LEXIS 4889, at *5-6 (Tex.App.-Houston [14th Dist.] June 1, 2004, pet. dism'd) (mem.op.) (not designated for publication); Denmark v. State, No. 06-02-00222-CR, 2004 WL 314884, at *3, 2004 Tex.App. LEXIS 1674, at *7 (Tex. App.-Texarkana Feb.20, 2004, no pet.) (not designated for publication); Tepp v. State, No. 2-03-240-CR, 2004 WL 254260, at **2-3, 2004 Tex.App. LEXIS 1430, at *7-9 (Tex. App.-Fort Worth Feb. 12, 2004, pet. ref'd untimely filed) (not designated for publication); Richmond v. State, No. 04-95-00326-CR, 1996 WL 452959, at **2-3, 1996 Tex.App. LEXIS 4670, at *6-9 (Tex.App.-San Antonio Aug.7, 1996, no pet.) (not designated for publication); Mosley v. State, No. 05-93-00606-CR, 1995 WL 314603, at **4-5, 1995 Tex. App. LEXIS 3857, at *11-12 (Tex.App.-Dallas May 22, 1995, no pet.) (not designated for publication).
[6] At trial, B.B. testified as follows:

Q. Okay. Now, when he touched you on your middle part, did it go inside or stay on the outside?
A. Outside.
Q. Okay. So it never went inside?
A. No.
Hermila Gomez, however, testified that B.B. reported that Saldaña had stuck his finger inside her private parts.
[7] Several courts of appeals, including our own, have rejected Saldaña's arguments, albeit in unpublished decisions. See, e.g., Veseley v. State, No. 12-06-00131-CR, 2007 WL 2045239, at **3-4, 2007 Tex.App. LEXIS 5611, at *9-10 (Tex.App.-Tyler July 18, 2007, no pet.) (mem.op.) (not designated for publication); Moreno v. State, No. 13-03-649-CR, 2005 WL 1413491, at **1-2, 2005 Tex.App. LEXIS 4091, at *4-5 (Tex.App.-Corpus Christi May 26, 2005, pet. ref'd) (mem.op.) (not designated for publication).
[8] See also Jochims v. State, No. 13-06-285-CR, 2007 WL 2142656, at **3-4, 2007 Tex. App. LEXIS 5905, at *9-10 (Tex.App.-Corpus Christi July 26, 2007, no pet.) (mem.op) (not designated for publication).
[9] Article 38.072 provides that outcry statements are not inadmissible under the hearsay rule if:

(1) on or before the 14th day before the date the proceeding begins, the party intending to offer the statement:
(A) notifies the adverse party of its intention to do so;
(B) provides the adverse party with the name of the witness through whom it intends to offer the statement; and
(C) provides the adverse party with a written summary of the statement;
(2) the trial court finds, in a hearing conducted outside the presence of the jury, that the statement is reliable based on the time, content, and circumstances of the statement; and
(3) the child testifies or is available to testify at the proceeding in court or in any other manner provided by law.
TEX.CODE CRIM. PROC. ANN. art. 38.072 § 2(b) (Vernon 2005).
[10] B.B. and B.A. are sisters with different last names. The notice incorrectly provided B.A.'s first name along with B.B.'s last name. However, the indictment clearly alleged in Count IV that Saldaña caused his mouth to contact B.A.'s anus. Saldaña does not contest the notice on this ground.