Opinion issued July 8, 2010.



In The

Court of
Appeals

For The

First District
of Texas

————————————

NOS. 01-09-00826-CR, 01-09-00827-CR,
01-09-00828-CR, 01-09-00829-CR, 01-09-00830-CR, 01-09-00831-CR, 01-09-00832-CR,
01-09-00833-CR

———————————

Donald Ray Eubanks, Appellant

V.

The State of
Texas, Appellee



 



 

On Appeal from the 405th District Court 

Galveston County, Texas



Trial Court Case Nos. 06CR3698, 06CR3699, 07CR3399, 07CR3400,
07CR3401, 07CR3402, 09CR1189, 09CR1188

 



 

O P I N I O N

          A
jury convicted appellant, Donald Ray Eubanks, of two counts of indecency with a
child, two counts of sexual performance by a child, two counts of possession of
child pornography, and two counts of aggravated sexual assault of a child.[1]  The jury assessed a total punishment of life in
prison and $80,000 in fines.  In seven
issues, appellant argues that (1) the evidence was legally insufficient to
establish that Bri.E.’s mouth contacted his penis; (2) the evidence was
factually insufficient to establish that Bri.E.’s mouth contacted his penis; (3)
the evidence was legally insufficient to establish that appellant produced a
photo that included sexual conduct by a child; (4) the evidence was legally
insufficient to establish that appellant possessed child pornography; (5)
double jeopardy prohibits him from being convicted of both sexual performance
by a child and possession of child pornography; (6) double jeopardy prohibits
appellant from being convicted on two indictments for possession of child
pornography that did not allege that he possessed different photos; and (7) the
trial court abused its discretion in admitting photos seized from appellant’s
computer.

          We
affirm.

Background

Appellant is the paternal
grandfather of the complainants, Bri.E. and Bro.E.  From the time the complainants were two years
old, they spent almost every Sunday afternoon with appellant and his wife, Francine
Eubanks.  In October 2006, the
complainants were visiting their aunt, Terri Moore, and playing with some
friends in Moore’s bedroom.  When Moore
came into the room, the girls immediately stopped talking in a way that Moore
found suspicious, so she asked the girls what they had been talking about.  The complainants, who were seven at the time,
told Moore that appellant was abusing them. 
Moore told the complainants’ mother, Jamie Eubanks.  The complainants’ visits with appellant and Francine
immediately stopped, and within the next few days, Jamie contacted the police,
took the complainants to Texas Children’s Hospital, and began the process of
seeking counseling for them.

Bro.E. told the doctor who examined
her that appellant “hurt me” and that sometimes when he hurt her he “messed
with my butt [and] sometimes my private.” 
The doctor testified that Bro.E identified her “private” as her
vagina.  Bro.E also told the doctor, “He
slobbered on my mouth.  My stomach and
back and neck he slobbered on and face [sic].” 
When the doctor asked her what appellant did with her butt and private,
Bro.E. responded, “He rubbed them with his feet and hands.  Sometimes there would be pictures.  Sometimes part of my clothes were off.  Sometimes my bottoms off and my shirt
off.  Sometime my underwear . . . or sometimes
nothing on [sic].”  Bro.E. told the
doctor that the abuse began when she and Bri.E. started first grade and
continued until the last time they had visited appellant.

Bri.E. told the doctor that appellant
touched her “in the wrong places . . . like in [my] pants and stuff.”  Bri.E. also testified that appellant took
pictures of her and Bro.E.  She also told
the doctor, “We would try to put our clothes on.  We finally told our mother because we were
getting scared.  We didn’t tell her
everything because we were embarrassed.” 
The doctor testified that she did not find any abnormalities or signs of
trauma during her physical examination of the complainants.  However, the doctor also testified that “in
the majority of cases . . . , approximately 90 percent of the . . .
evaluations, we don’t find any evidence of trauma.”  She testified that the lack of physical trauma
or injuries did not mean that the girls were not telling the truth.  She testified that the complainants’
descriptions of the abuse and the time that had passed between the last
incident and the exam led her to believe that a finding of no physical trauma
could still have been consistent with their allegations.

Based on the complainants’
interviews with a forensic examiner at the Children’s Advocacy Center in
Galveston and police interviews with the complainants’ mother and aunt, the
police obtained a search warrant for appellant’s home.  Police seized computers, wireless
surveillance cameras, and external hard drives. 
A special agent with the Secret Service, W. Bracas, found 105 images of
the complainants on appellant’s computer saved under appellant’s username in a
file entitled “9806 B&B.”  Appellant
also gave a statement in which he denied all of the allegations.[2]

Approximately one month after the
complainants made their outcry, they began receiving counseling from Carol
Stephens, a psychotherapist.  Stephens
testified that it is common for victims of abuse to slowly disclose the details
of what happened to them over a period of time, stating, “[The] first outcry is
extremely difficult.  So it’s highly
unusual that they are going to immediately disclose everything.”  Stephens testified that, as child abuse
victims begin to feel safer in their environment, “it [makes] it easier for
them to open up.”

Stephens testified that, as part of
her treatment of the complainants, she discussed the abuse with them “a
lot.”  She testified that Bri.E.
specifically disclosed to her, in her first private session, that her
grandfather “would force her to put his penis in her mouth and put his hand on
the back of her head and pull her head down.” 
Bri.E. told Stephens, “I hated it. 
It tasted terrible and it stunk down there.”  Bro.E. told Stephens later in their treatment
that her grandfather had contacted or touched her vagina with his mouth.

Stephens also testified that in the
course of her treatment of the complainants, she had seen a tremendous
improvement in their behavior, and that they had gone from having trouble in
school and demonstrating excessive anger, feelings of shame and guilt,
excessive crying, fear, and nightmares to being “two beautifully thriving
10-year-old girls” who are “normal 10-year-old girls as far as their behavior
goes right now.”  Several family members
also testified that the complainants demonstrated problematic behavior prior to
their outcry that improved once they were no longer in contact with appellant
and were receiving treatment.  In
particular, the girls’ aunt, Terri Moore, testified that the girls had had
trouble in school and that she observed them on more than one occasion
attempting to touch her son inappropriately, but that after the girls made
their outcry, their behavior improved tremendously.  The complainants’ maternal grandfather,
Harvey Moore, also testified that while the complainants lived with him and his
wife, from the time the girls were two until they were five or six, the
complainants behaved inappropriately on occasion and had some trouble at
school.  Specifically, he testified, 

I would be holding them and
they would touch me [on my penis] and kind of giggle about it.  And that happened, I don’t know, three or
four times.  And I kept telling them that
that’s not appropriate, we don’t do that. 
And it took three or four times to get it across to them not to do that.

 

The complainants themselves
testified at trial.  Bro.E. testified
that she was assaulted by her grandfather, appellant.  She testified that appellant “touched me in
bad places,” particularly indicating that he touched her breasts, vagina, and anus
with his hand and mouth.  She also
testified that appellant had her touch his nipple, penis, and bottom.  Bro.E. also testified that she saw appellant
touch her sister, Bri.E., “the same places I had been touched.”  When the State asked her who would be at
appellant’s house when the abuse happened, she replied, “Either me, my sister
and him or only me and him.”  She testified
that she and Bri.E. would fight about who had to stay with appellant and who
got to go to the mall with Francine.  She
also testified that appellant took pictures of her naked, that it was his idea
to take the pictures, that the poses in the pictures were his idea, and that
she did not want to take them.  She
testified that she would wear “a bathing suit cover or nothing or my
underwear.”  She testified that appellant
told the girls to “pose” and touch each other in the same places that appellant
touched them—their breasts and
vaginas.  She testified that she never
told him not to take the pictures because she was scared and that appellant
told her she “would get in a huge amount of trouble” if she ever told anyone
what was happening.  Bro.E. testified
that since she quit going to appellant’s house and started getting counseling,
nothing like the abuse has ever happened to her again.

Bri.E. also testified that
appellant “messed with her” and that he touched her vagina, breasts, and anus
with his hand and foot.  She testified
that, although appellant was in a wheelchair and could not move his feet, he
would tell her to “get at the bottom of the bed and he’d get at the top of the
bed” and to move his foot up and down with her hands.  Bri.E. also testified that he kissed her on
the mouth like “we were getting married.” 
When asked if she had ever had to touch appellant anywhere other than
his mouth with her mouth, she said no. 
She also said that she did not remember ever telling anyone that she had
to touch his penis with her mouth.  She
testified that the last time the abuse happened was three years ago, that the
details were a little hard to remember, and that it was harder to remember now
than it was in the beginning.  Bri.E.
testified that she did not tell everybody everything that happened in the
beginning because she was scared of getting in trouble.  On cross examination, appellant’s counsel
asked, “Did he ever make you put your mouth on his private,” and Bri.E.
answered no.  Counsel asked a couple of
other specific questions, then said, “You’re sure that he didn’t do those
things I just asked you about?”  Bri.E.
responded, “Yes—I’m not
sure.  It could have happened, but I just
don’t remember it.”  Bri.E. also
testified that she told the forensic investigator, Kim Herd, something that was
not true—that appellant had
handcuffed her—but it had been a long time
since she talked to the investigator and did not remember telling Herd that
appellant tied her up.  Bri.E. also
testified that appellant took pictures of her and of Bro.E, that he told them
“how to be” in the pictures, that she would sometimes be wearing nothing or
sometimes wearing “some clothes,” that appellant would tell her and Bro.E. to
touch each other’s “privates,” and that she sometimes saw appellant do things
to Bro.E.

Appellant, his wife Francine, and a
urologist testified on appellant’s behalf. 
The urologist testified that appellant had suffered a spinal injury in
1982 that left him wheelchair-bound and without feeling below the bottom of his
ribcage.  He also testified that at some
point, appellant had received a penile implant that allowed him to achieve an
erection, but the implant was no longer functional at the time he first
examined appellant a few months earlier. 
The urologist testified that appellant was not able to achieve or
maintain an erection or void his bladder on his own and had no feeling below
the waist. 

Francine testified that she had
been married to appellant for 35 years and that he was injured in a car crash
in 1982 that resulted in his losing all of the feeling and function below his
waist.  She testified that he was not
capable of sexual relations, had no feeling in that area, and is not able to
achieve an erection. She testified that appellant received the implant for her,
“for us to have some semblance of normal relations in our marriage.”  She testified that it only worked for just a
few years and had stopped working by 1990. 
Fran testified that the girls would visit them often on Sundays and that
the girls sometimes acted inappropriately. 
Specifically, she testified that at dinner, “they had one hand on a fork
eating the meal and the other hand in their genitals.  And we couldn’t even finish the meal without—I would have to call them down and say, ‘What
are you doing . . . We’re eating and that’s inappropriate. . . . Are you hurt?
. . . What’s going on.’”  She also
testified that Bro.E. “grabbed my hand on several occasions and put it in her
crotch and said, ‘Touch me, Mimi, and make me feel good.’”  Francine testified that she never saw them do
anything inappropriate with appellant, but that she knew “that [Bri.E.] wanted
him to take his clothes off and get in the shower with her.”  She testified that she and appellant became
concerned that the complainants were being sexually abused, and that they
talked to Jaime about their concerns regarding the girls’ masturbation and
sexually acting out, and that the girls told her and appellant they were posing
for pictures.  Fran testified that Jamie
responded by crying and telling them that she did not want anyone to “shame”
her kids and that she did not care if her girls masturbated.  

Francine testified that she would
frequently take one of the girls out to run a quick errand or to go to the
mall.  The State showed Francine some of
the photographs recovered from appellant’s computer.  She testified that the photos where appellant’s
feet were included in the picture and one of the girls was sitting on the end
of the bed in just her underwear were not inappropriate.  Specifically, she stated, “They’re
posing.  They’re playing.  This is what—this sort of stuff alarmed us. 
This was what we told Jamie about. 
This is what they wanted to do.” 
When the State showed her a picture of one of the girls with her top
pulled down to expose her breasts that was taken the same day, Francine
testified that one of the complainants took the picture, but she stated that
she “probably” did not see them taking those pictures.  When she was shown a picture of the two
complainants lying on a bed wearing only white bikini underwear and bunny ears,
with one girl kissing the pubic area of the other girl on top of the underwear,
Francine testified that the picture was inappropriate and that it was taken by
the complainants’ father, her son.  Francine
testified that she told Detective Grant that her son took inappropriate photos of
the girls, but, in rebuttal testimony, Detective Grant testified that Francine
never mentioned that her son took photos of the girls.

Appellant also testified that he
had suffered a spinal injury in 1982 and repeated Francine’s testimony that the
implant only worked for a few years, that he did not have any feeling from his
waist to his toes, and that they did not have sexual relations.  He also testified that he and Francine would
see the complainants on most Sundays.  He
testified that he once woke up to realize that Bro.E. had her hand in his pants,
and that sometimes when they were showering after being in the spa, the girls
would try to pull his swimming trunks off. 
He also testified that he and Francine became concerned that the
complainants were being abused and that the girls told him and Francine that
they “do this” with their other grandfather and their mother’s boyfriend and
“every other male in the family.”  

When asked about who took the
pictures, appellant responded, “there were three adults and two kids in that
house all that time.  So some were taken
by adults and some were taken by the girls. 
I think the most upsetting pictures were taken by the girls.  That’s when we decided to go to their
mom.  But over time they had started how
they would—they started to
deteriorate.  Started wanting to sit with
their legs up and they started wanting to pull their little tops down.  And, yeah, that was distressing by a 7-year-old.”  Appellant testified that he tried to show the
pictures to Jamie, but she did not want to see them and told him and Francine
that she was aware of the complainants’ behavior.  He testified that he and Francine thought that
the girls began acting out around the time their father was not coming to see
them like he promised and there was a lot of turmoil with their mom and her
boyfriend breaking up.  Appellant also
testified that his son took one of the photographs, State’s exhibit 1, and when
the State pointed out that the file had been created after the time that
appellant stated his son had moved out of the house, appellant only answered
that he thought those dates were subject to change.  Appellant admitted that he never told the
detective that his son took any photographs, but he also stated that, at the
time he talked to Detective Grant, he did not know what pictures were being
talked about.  In rebuttal testimony,
Jamie denied that Francine and appellant had tried to show her inappropriate
pictures during their talk a couple of weeks before the girls made their
outcry.

All eight charges were submitted to
the jury without any objection to the charges by appellant, and the jury
convicted him on all eight offenses. 
This appeal followed.

Legal and Factual Sufficiency

In his first four issues, appellant
contests the legal and factual sufficiency of the evidence against him.

 

 

A.      Standard of Review

          When an appellant challenges both the legal and
factual sufficiency of the evidence, we must first determine whether the
evidence was legally sufficient to support the verdict.  Harmond v. State, 960 S.W.2d 404, 406
(Tex. App.—Houston [1st Dist.] 1998, no pet.). 
We review the legal sufficiency of the evidence by viewing the evidence
in the light most favorable to the verdict to determine whether any rational
trier of fact could have found the essential elements of the crime beyond a
reasonable doubt.  King v. State,
29 S.W.3d 556, 562 (Tex. Crim. App. 2000). 
Although our analysis considers all the evidence presented at trial, we
may not re-weigh the evidence and substitute our judgment for that of the fact
finder.  Id.

          Factual
sufficiency analysis is broken down into two prongs.  First, we must ask whether the evidence
introduced to support the verdict, although legally sufficient, is so weak that
the jury’s verdict seems clearly wrong and manifestly unjust.  Watson v. State, 204 S.W.3d 404,
414–15 (Tex. Crim. App. 2006) (quoting Johnson v. State, 23 S.W.3d 1, 11
(Tex. Crim. App. 2000)).  Second, we must
ask whether, considering the conflicting evidence, the jury’s verdict, although
legally sufficient, is nevertheless against the great weight and preponderance
of the evidence.  Id. at 415.  In conducting this review, we view all of the
evidence in a neutral light.  Id.
at 414.  We are also mindful that a jury
has already passed on the facts and that we cannot order a new trial simply
because we disagree with the verdict.  Id.  What weight to give contradictory
testimonial evidence is within the sole province of the jury because it turns
on an evaluation of credibility and demeanor.  Cain v. State, 958 S.W.2d 404, 408–09
(Tex. Crim. App. 1997). Therefore, we must defer appropriately to the fact
finder and avoid substituting our judgment for its judgment, and we may find
evidence factually insufficient only when necessary to prevent manifest
injustice.  Id. at 407; see
also Johnson, 23 S.W.3d at 12.

B.      Sufficiency
of the Evidence of Aggravated Sexual Assault of Bri.E.

          In his first two issues, appellant
argues that the evidence is legally and factually insufficient to establish
that Bri.E.’s mouth contacted appellant’s penis.

          The indictment for aggravated sexual
assault of Bri.E. alleged that appellant caused his penis to contact and
penetrate Bri.E.’s mouth.  Thus, the
State was required to prove beyond a reasonable doubt that appellant
intentionally or knowingly caused the penetration of the mouth of a child
younger than 14 years of age by his sexual organ or that he caused the mouth of
a child to contact his sexual organ.  See Tex.
Penal Code Ann. § 22.021 (Vernon Supp. 2009).

          Here, Stephens testified that Bri.E. specifically disclosed, in her first private
session, that her grandfather “would force her to put his penis in her mouth
and put his hand on the back of her head and pull her head down.”  Bri.E. told Stephens, “I hated it.  It tasted terrible and it stunk down
there.”  Outcry testimony alone can be
legally sufficient evidence to support a conviction.  Rodriguez
v. State, 819 S.W.2d 871, 873 (Tex. Crim. App. 1991).  There is no requirement that outcry testimony
admitted as substantive evidence be corroborated or substantiated by the victim
or independent evidence.  Id. at 874.  

Appellant argues that this evidence
is legally insufficient because Stephens did not specify whether the
“grandfather” causing the contact was appellant or her maternal grandparent,
Harvey Moore.  Appellant argues that
Moore also had “sexual contact” with the complainants because Moore testified
that the complainants touched his penis several times while they were living
with him and his wife.  However,
appellant’s argument takes the evidence and testimony out of context.  Stephens testified that she was treating the
complainants for emotional and behavioral issues arising from their outcry of
abuse committed by appellant.  The
complainants never made any outcry of abuse committed by any other person, nor
did any witness at trial testify about any abuse committed by any other person.  Furthermore, Moore’s testimony was made in
the context of demonstrating the complainants’ emotional and behavioral state
prior to their outcry and contrasting that with their improved emotional and
behavioral state after visits with appellant were suspended and they began
receiving treatment.  

Thus, viewing the evidence in the
light most favorable to the judgment and giving due deference to the fact
finder, we hold that the evidence was legally sufficient for a rational fact finder
to have found beyond a reasonable doubt that appellant caused his penis to
contact Bri.E.’s mouth.  See King, 29 S.W.3d at 562; Rodriguez,
819 S.W.2d at 874.  

          Appellant also argues that the
evidence is factually insufficient because Bri.E. testified at trial that
appellant did not ever make her contact his penis with her mouth.  However, as we have already discussed, there is no requirement that outcry testimony
admitted as substantive evidence be corroborated or substantiated by the victim
or by independent evidence.  Rodriguez, 819 S.W.2d.at 874; see also Saldana v. State, 287 S.W.3d 43, 60 (Tex. App.—Corpus Christi 2008, pet. ref’d) (holding that
outcry witness’s testimony was sufficient to support conviction for aggravated
sexual assault notwithstanding complainant’s inconsistent testimony at trial). 


Furthermore, “[w]hen
a witness recants prior testimony, it is up to the fact finder to determine
whether to believe the original statement or the recantation,” and “[a] fact
finder is fully entitled to disbelieve a witness’s recantation.”  Saldana,
287 S.W.3d at 60 (citing Chambers v.
State, 805 S.W.2d 459, 461 (Tex. Crim. App. 1991)); see also Cain, 958
S.W.2d at 408–09 (holding that jury was
sole judge of weight to give contradictory testimonial evidence).  Bri.E. testified that the details of
appellant’s abuse of her were harder to remember now than they were three years
earlier when she made the outcry, and when asked specifically if she was sure
that appellant had not made her contact his penis with her mouth, she stated
that she was not sure and “[i]t could
have happened, but I just don’t remember it.”

Considering all of the evidence in a neutral light, we cannot
conclude that the evidence was so weak that the jury’s verdict seems clearly
wrong and manifestly unjust, nor was the jury’s verdict against the great
weight and preponderance of the evidence. 
See Watson, 204 S.W.3d at 414–15.  Thus, we hold that the evidence was factually
sufficient to support appellant’s conviction for aggravated sexual assault of
Bri.E.

          We overrule appellant’s first and
second issues.

C.      Legal
Sufficiency of Sexual Performance by a Child and Possession of Child
Pornography

 

          In his third and fourth issues,
appellant argues that the evidence is legally insufficient to establish that he
produced a sexual performance that included sexual conduct by a child and that
he possessed child pornography. 
Specifically he argues that the photos that he was alleged to have
produced and possessed were of the “girls’ undeveloped chests” and “did not
depict ‘breasts’” for purposes of the sexual performance by a child and
possession of child pornography statutes.

          A person commits the offense of sexual
performance by a child if “knowing the character and content of the material,
he produces, directs, or promotes a performance that includes sexual conduct by
a child younger than 18 years of age.”  Tex. Penal Code Ann. § 43.25(d) (Vernon Supp. 2009).  The Penal Code defines “sexual conduct” to
include “lewd exhibition of the genitals, the anus, or any portion of the
female breast below the top of the areola.” 
Id. § 43.25(a)(2).  Similarly, a person commits the offense of
possession of child pornography if he “knowingly or intentionally possesses
visual material that visually depicts a child younger than 18 years of age at
the time the image of the child was made who is engaging in sexual conduct
[and] the person knows that the material depicts the child as described
[above].”  Tex. Penal Code Ann. § 43.26(a) (Vernon 2003).  Section 43.26 provides that “‘sexual conduct’
has the meaning assigned by Section 43.25.” 
Id. § 43.26(b)(2).

          Neither of these statutes require that
the child’s breasts be “developed,” and the definition of “sexual conduct” as
applies to both offenses specifically contemplates that a “lewd exhibition of .
. . any portion of the female breast below the top of the areola” is sufficient
to constitute “sexual conduct” as required for the offenses of sexual
performance by a child and possession of child pornography.  See id.
§ 43.25(a)(2).  The evidence
presented at trial included both complainants’ testimony that appellant forced
them to pose for pictures that they did not want to take and that appellant
told them to pose in ways that exposed their breasts below the areola,
genitals, and anus and that showed them engaged in sexual contact with each
other.[3]  Additionally, the State introduced multiple
photographs with lewd exhibitions of the complainants’ breasts below the top of
the areola, their genitals, and anuses and that demonstrated them engaging in
sexual contact with each other.  Thus, we
conclude that the evidence was legally sufficient to support appellant’s
conviction for both sexual performance by a child and possession of child
pornography.

          We overrule appellant’s third and
fourth issues.

Double Jeopardy

          In his fifth and sixth issues,
appellant argues that his constitutional protection against facing double
jeopardy was violated.

A.      Standard
of Review

Appellant never objected to the charge at trial or
asserted any double jeopardy complaint prior to this appeal.  However, a double jeopardy claim can be
raised for the first time on appeal if the undisputed facts make the double
jeopardy violation apparent from the record.  See Gonzalez v. State, 8 S.W.3d 640, 643
(Tex. Crim. App. 2000).  Specifically, a
defendant may raise a double jeopardy claim for the first time on appeal when (1) no further proceedings
are required to “expand the record with new evidence” and the claim can be
resolved “on the basis of the existing record”; and (2) “enforcement of the usual
rules of procedural default serves no legitimate state interest.”  Id. at 643–44 (citing United States
v. Broce, 488 U.S. 563, 575, 109 S. Ct. 757, 765–66 (1989) and Menna v.
New York, 423 U.S. 61, 63, 96 S. Ct. 241, 242 (1975)); see also Langs v. State, 183 S.W.3d 680, 687 (Tex. Crim.
App. 2006) (“[A] potential multiple-punishment double jeopardy claim may be
forfeited if a defendant does not properly preserve that claim.”) (citing Gonzales,
8 S.W.3d at 642–43).  Therefore, we must
first determine whether appellant’s double jeopardy complaint can be resolved
on the basis of the existing record and is, therefore, preserved.

Double
jeopardy is the principle that a person shall not be “subject for the same
offense to be twice put in jeopardy of life or limb.”  U.S. Const.
amend V.  These prohibitions protect
against a second prosecution for the same offense after acquittal, a second
prosecution for the same offense after conviction, and multiple punishments for
the same offense.  Ex parte Herron,
790 S.W.2d 623, 624 (Tex. Crim. App. 1990). 
When a defendant is subjected to a single trial only, the protection
against multiple punishments is applicable.  See id. 

          A
double jeopardy claim of multiple punishments for the same offense can arise in
two contexts: (1) when a greater offense also meets the elements of a
lesser-included offense, and the same conduct is punished twice; and (2) when
the same criminal act is punished under two distinct statutes when the
legislature intended the conduct to be punished only once.  Langs,
183 S.W.3d at 685.  For double jeopardy purposes, “[t]he same
offense means the identical criminal act, not the same offense by name.”  Luna v. State, 493 S.W.2d 854, 855
(Tex. Crim. App. 1973) (stating that if indictments do not determine whether
offenses prosecuted are same, this court will look to proof offered at trial).

Sameness in this context is “purely a matter of legislative
intent,” and the “traditional indicium of
that legislative intent is the so-called ‘same element’ test of Blockburger v.
United States.”  Gonzales v. State, 304 S.W.3d 838, 845 (Tex. Crim. App. 2010)
(citing Blockburger v. United States,
284 U.S. 299, 52 S. Ct. 180 (1932)).  “According
to that test, it should be presumed that the Legislature did not regard two statutorily
defined offenses to be the same so long as ‘each provision requires proof of a
fact which the other does not.’”  Id. (quoting Blockburger, 284 U.S. at 304, 52 S. Ct. at 182).  The Texas Court of Criminal Appeals has also “recognized that ‘[t]he Blockburger test’s
status as a mere rule of statutory construction raises an inverse conclusion as
well: the Blockburger
test cannot authorize two punishments where the legislature clearly intended
only one.’”  Id. (quoting
Ex parte Ervin, 991 S.W.2d 804, 807
(Tex. Crim. App. 1999)).  The court
stated:

Thus, even if a straightforward application of
the Blockburger
test would suggest that two offenses are not the “same” for double-jeopardy
purposes, if other indicia manifest a legislative
intent that an accused not be punished for both offenses if they occur in the
course of a single transaction, then an accused may not be punished for both
offenses.  Ervin provided a non-exclusive catalog of considerations to help
courts determine legislative intent in this context: whether
the offenses[’] provisions are contained within the same statutory section,
whether the offenses are phrased in the alternative, whether the offenses are
named similarly, whether the offenses have common punishment ranges, whether
the offenses have a common focus (i.e. whether the “gravamen” of the offense is
the same) and whether that common focus tends to indicate a single instance of
conduct, . . . and whether there is legislative history containing an
articulation of an intent to treat the offenses as the same or different for
double jeopardy purposes.

 

Id.
at 845–46 (quoting Ervin, 991 S.W.2d
at 814).

B.      Sexual
Performance by a Child and Possession of Child Pornography

          In his fifth issue, appellant argues
that double jeopardy prevents him from being punished for both producing and
possessing pornographic photos of a child. 
Appellant’s first indictment for sexual performance by a child alleged
that appellant “did . . . intentionally or knowingly produce a performance,
to-wit: a photograph that included sexual conduct by [Bri.E.], a child younger
than 18 years of age, and the defendant knew the character and content of the
material.”  Appellant’s second indictment
for sexual performance by a child made identical allegations regarding Bro.E.  Appellant’s indictments for possession of
child pornography alleged that appellant “did . . . intentionally or knowingly
possess visual material that visually depicted, and which the defendant knew
visually depicted a child who was younger than 18 years of age at the time the
image of the child was made, engaging in sexual conduct, to-wit: actual lewd
exhibition of female breast below the top of the areola.”  Appellant argues that “[t]he allegation that
appellant produced photos that included sexual conduct by the girls necessarily
included the allegation that he possessed the photographs.  Thus, possession of child pornography is a
lesser included offense of sexual performance by a child as alleged in the
respective indictments.”

In determining whether a double jeopardy violation is
apparent on the face of the record, we first examine appellant’s claim that
possession of child pornography is a lesser included offense of sexual
performance of a child as alleged in the indictments against him and thus constituted
the same offense.  As we have already
discussed, a person commits the offense of sexual performance by a child if,
“knowing the character and content of the material, he produces, directs, or
promotes a performance that includes sexual conduct by a child younger than 18
years of age.”  Tex. Penal Code Ann. § 43.25(d).  Sexual conduct is defined as “sexual contact,
actual or simulated sexual intercourse, deviate sexual intercourse, sexual
bestiality, masturbation, sado-masochistic abuse, or lewd exhibition of the
genitals, the anus, or any portion of the female breast below the top of the
areola.”  Id. § 43.25(a)(2).  Sexual
performance is defined as “any performance or part thereof that includes sexual
conduct by a child younger than 18 years of age.”  Id. §
43.25(a)(1).  Performance is defined as
“any play, motion picture, photograph, dance, or other visual representation
that can be exhibited before an audience of one or more persons.”  Id. §
43.25(a)(3).

A person commits the offense of possession of child
pornography if he “knowingly or intentionally possesses visual material that
visually depicts a child younger than 18 years of age at the time the image of
the child was made who is engaging in sexual conduct [and] the person knows
that the material depicts the child as described [above].”  Tex.
Penal Code Ann. § 43.26(a).  Thus, the
statutes require two different acts. 
Section 43.25 requires that the actor engage in specific conduct—that he employ, authorize, or induce
a child to engage in sexual conduct or a sexual performance.  See id.
§
43.25.  It does not require that
appellant still possess the “performance” that he produced.  See id.
§ 43.25(a)(3), (4) (defining “performance” and “produce”).  Section 43.26, on the other hand, requires
possession of visual material that visually depicts a child who is engaging in
sexual conduct.  See id. § 43.26.  We conclude
that each provision requires proof of a fact that the other does not and thus,
sexual performance by a child and possession of child pornography are not the
same offense for double jeopardy purposes. 
See Gonzales, 304 S.W.3d at 845.

Thus, application of the Blockburger
test in this case establishes the presumption that the Legislature did not regard the two statutorily defined
offenses of sexual performance by a child and possession of child pornography to
be the same.  See Gonzales, 304 S.W.3d at 845.  Appellant does not point to any “other indicia” that would “manifest
a legislative intent that an accused not be punished for both offenses if they
occur in the course of a single transaction,” nor do we find any.  See id. at
845–46 (quoting Ervin, 991 S.W.2d at 814).  Furthermore, we note this is not a
situation where appellant is being punished multiple times for the same
criminal act.  The State admitted 104
photographs into evidence that could have been considered for purposes of
either offense, and it also admitted the testimony of both complainants
establishing that appellant induced them into sexual performances by making
them pose for lewd photographs.  For
double jeopardy purposes, possession of each image of child pornography
constitutes an allowable unit of prosecution. 
See Vineyard v. State, 958
S.W.2d 834, 837–38 (Tex. Crim. App. 1998) (noting that legislature’s use of
singular term “film image” in statute indicated, for double jeopardy purposes,
that that possession of each film image of child pornography constituted
allowable unit of prosecution). 
Considering the similar wording of the sexual performance of child
statute, we conclude that each instance in which an actor employs, authorizes,
or induces a child to engage in sexual conduct or a sexual performance is an
allowable unit of prosecution.  See Tex.
Penal Code Ann. § 43.25(a), (b) (using singular “sexual performance,”
defined as any “play, motion picture, photograph, dance, or other visual
representation that can be exhibited before an audience of one or more persons”
in stating elements of sexual performance by child).[4]

          We overrule appellant’s fifth issue.

C.      Separate
Indictments of Possession of Child Pornography

          In his sixth issue, appellant argues
that double jeopardy prevented him from being found guilty of two counts of
possession of child pornography when the indictments did not allege that he
possessed different photos.

          Here, the State’s pleadings do not
make it clear exactly which of the 104 photographs entered into evidence formed
the basis of each offense.  Thus, we may
look at the evidence presented.  See Luna, 493 S.W.2d at 855.  The
State specifically recommended that the jury examine exhibits one and three,
both of which contained a lewd exhibition of the female breast below the
areola, to determine if appellant was guilty of possession of child
pornography.  The State introduced at
least 28 additional photographs that exhibited the complainants’ breasts below
the areola.  Thus, the evidence
introduced at trial clearly demonstrates that appellant’s two counts for
possession of child pornography were based on separate photographs.  See id.;
see also Vineyard, 958 S.W.2d at 837–38 (holding that, for double jeopardy
purposes, possession of each image of child pornography constitutes allowable
unit of prosecution).

          We overrule appellant’s sixth issue.

Motion to Suppress

          In his seventh issue, appellant argues
that the trial court erred in denying his motion to suppress and admitting
evidence obtained from the computers taken from his home because the affidavit supporting
the search warrant did not state probable cause to justify the seizure of the
computers.

A.      Facts
Regarding Probable Cause Affidavit and Search Warrant

The search warrant was issued pursuant to an affidavit by
Detective Grant asserting that he believed appellant “has possession of and is
concealing at said suspected place . . . pictures [and] photographs of the
victims or other victims [including] all pictures of photos that depict a child
younger than 18 years of age engaged in sexual conduct.”  Detective Grant also averred in his affidavit
that property consisting of “all video and DVD recording material,” “all
computer hardware and software,” and “all camera related equipment both digital
[and] film” that could be used in depicting children younger than 18 years of
age engaged in sexual conduct constituted evidence of the alleged offense.  Detective Grant stated that he had probable
cause for these beliefs because in the course of his interview with the
complainants’ mother Jamie, she

advised that she spoke to her sister, Terry Moore who
told her that she overheard her two daughters talking about someone touching
them. . . .  When she
questioned [the complainants’] about this both girls became very defensive and
said that Grand-pa, meaning Donald Eubanks, said they would get in trouble if they
told anyone what happened.

 

Detective
Grant averred that he also interviewed Moore, who told him that the
complainants told her that appellant touched them “in places he shouldn’t.”  Detective Grant also related in the probable
cause section of his affidavit disclosures made by the complainants during
their interview with Kim Herd at the Child Advocacy Center in Galveston.  Both girls told Herd that appellant would
touch their “privates” and made them pose for pictures in which they were
sometimes partially or totally nude. 
Detective Grant further averred that Bri.E. “said that she saw
[appellant] put the pictures under his bed or in the closet in his bedroom.”

          Detective Grant averred that he
“talked with League City evidence officer Thomas Garland and he advised that on
a digital camera, even if the image has been deleted, if it was saved to the
sim card or hard drive, then the deleted image would be recoverable.”  Detective Grant concluded his statement of
probable cause by averring:

Your affiant believes that the foregoing facts
establish probable cause that the offenses of sexual assault were committed on
or before October 11th, 2006, in Galveston County, Texas; that pictures, video
and DVD’s, computers and related computer equipment and storage devices,
cameras and video recording devices if found in the premises described above,
constitute[] evidence of said offense; and that the evidence to be searched for
is likely to be located in said premises.

 

The
judge of the 56th District Court of Galveston County issued the search warrant,
stating, “I find that the verified facts stated by Affiant in said Affidavit
show that Affiant has probable cause for the issuance of this Warrant.”  The search warrant authorized officers to
“search for the property described in said Affidavit, to-wit: Pictures, photos,
videos and DVD’s, rope or other binding material, all computer related
equipment including storage devices, cameras and video recording devices.”

B.      Standard of Review

      We review a trial court’s ruling on a
motion to suppress under a bifurcated standard of review.  McKissick
v. State, 209 S.W.3d 205, 211 (Tex. App.—Houston [1st Dist.] 2006, pet.
ref’d).  We give almost total deference
to the trial court’s determination of historical facts that depend on
credibility, while we review de novo the trial court’s application of the law
to those facts.  Id.  Thus, we review de novo
the trial court’s application of the law of search and seizure and probable
cause.  Id.  However, our review of
an affidavit in support of a search warrant is not de novo; rather, great
deference is given to the magistrate’s determination of probable cause.  Id.

      No search warrant may
issue unless supported by an affidavit setting forth
substantial facts establishing probable cause for its issuance.  Tex. Code Crim. Proc. Ann. arts. 1.06,
18.01(b) (Vernon 2005 & Supp. 2009). 
The issuance of a search warrant for
“items” requires that the peace officer first present to a magistrate a sworn affidavit setting forth sufficient facts to establish probable cause that (1) a specific
offense has been committed; (2) the specifically described property or items to
be searched for or seized constitute evidence of that offense or evidence that
a particular person committed that offense; and (3) the property or items
constituting such evidence are located at or on the particular person, place,
or thing to be searched.  Tex. Code Crim. Proc. Ann. arts. 18.01(c),
18.02(10) (Vernon 2005).

“The test for determination of probable cause is whether the
magistrate had a substantial basis for concluding that a search would uncover
evidence of wrongdoing.”  McKissick, 209 S.W.3d at 211 (citing Illinois
v. Gates, 462 U.S. 213, 236–37,
103 S. Ct. 2317, 2331 (1983)).  Probable cause exists when, under the totality
of the circumstances, the facts submitted to the magistrate are
sufficient to justify a conclusion that the object of the search is probably on
the premises to be searched at the time the warrant is issued.  Id.
 A reviewing court may consider only the
facts found within the four corners of the affidavit when
evaluating a complaint that a search warrant affidavit does not establish probable cause.  Id. at 212.  Reasonable inferences
may be drawn from the affidavit, and the affidavit must be interpreted in a
common sense and realistic manner.  Id.

C.      Analysis

          Here, appellant contends that the
affidavit for the search warrant did not state probable cause to justify the
seizure of the computers because the affidavit “afforded no basis for the
magistrate to conclude that appellant even had a computer at home, much less
that he took pornographic photos of the girls with a digital camera and
transferred them onto a computer.” 
Appellant points out that neither complainant “mentioned a computer or a
digital camera” and that Bri.E. stated that she “saw him ‘put the pictures
under his bed or in the closet in his bedroom.’”

          However, the affidavit (1) alleged
that “the offenses of
sexual assault were committed”; (2) specifically described “pictures, video and
DVDs, computers and related computer equipment and storage devices, cameras and
video recording devices” as property or items to be searched for or seized that
constituted evidence of that offense or evidence that appellant committed that
offense; and (3) stated that the property or items constituting such evidence
are “likely to be located in said premises.”  See Tex.
Code Crim. Proc. Ann. arts. 18.01(c), 18.02(10).  The affidavit was supported by the complainants’ allegations
that appellant touched them inappropriately and that they posed for
inappropriate photographs.  Although neither
complainant specifically mentioned the use of a digital camera or a computer,
it was reasonable for the magistrate to infer from the information in the
affidavit that the complainants were photographed and that a digital camera and
computer could have been used in the process of taking inappropriate
photographs of the girls and could probably be found on the premises to be
searched.  See McKissick, 209 S.W.3d
at 211–12 (holding that reasonable inferences may be drawn from affidavit, and
affidavit must be interpreted in common sense and realistic manner).  Furthermore, all of the information in the
affidavit indicated that all of the assaults and pictures of the girls engaged
in sexual conduct were taken at appellant’s residence and that Bri.E. saw appellant
hide some of the pictures in his bedroom. 
Thus, it was likewise reasonable for the magistrate to conclude that any
items like photographs, computer equipment, or cameras used in the commission
of the offenses was located in appellant’s home.  See, e.g., State v. Barnett,
788 S.W.2d 572, 576 (Tex. Crim. App. 1990) (“Once the probable cause has been
established and the object of the search particularly described, the scope of
the search ‘generally extends to the entire area in which the object of the
search may be found.’”) (quoting United States v. Ross, 456 U.S. 798,
820, 120 S. Ct. 2157, 2170 (1982)).

          Thus,
considering the facts contained in the four corners of the affidavit and the
reasonable inferences therefrom in the totality of the circumstances, we
conclude that the magistrate
had a “substantial basis for concluding that a search would uncover evidence of
wrongdoing” and that the facts submitted to the magistrate were sufficient to
justify a conclusion that the objects of the search were probably on the
premises to be searched at the time the warrant is issued.  See McKissick,
209 S.W.3d at 212.

          We overrule appellant’s seventh issue.

Conclusion

We affirm the judgment of the trial court.

 

 

 

                                                                   Evelyn
V. Keyes

                                                                   Justice


 

Panel
consists of Justices Keyes, Hanks, and Higley.

Publish.  Tex.
R. App. P. 47.2(b).











[1]
          All eight cause numbers were
tried together.  Cause number 06CR3698
was for the offense of indecency with a child for touching Bri.E.’s genitals,
resulting in appellate cause number 01-09-00826-CR.  Cause number 06CR3699 was for the offense of
indecency with a child for touching Bro.E.’s genitals, resulting in appellate
cause number 01-09-00827-CR.  See Tex.
Penal Code Ann. § 21.11 (Vernon Supp. 2009) (stating elements for
offense of indecency with a child).  For
both of these cause numbers, the jury found appellant guilty and assessed a
punishment of 20 years in prison and a $10,000 fine.

 

Cause
number 07CR3399 was for the offense of sexual performance by a child for
producing a performance from Bri.E., resulting in appellate cause number
01-09-00828-CR.  Cause number 07CR3400
was for the offense of sexual performance by a child for producing a
performance from Bro.E, resulting in appellate cause number
01-09-00829-CR.  See Tex. Penal Code Ann.
§ 43.25 (Vernon Supp. 2009) (stating elements for offense of sexual performance
by child).  For both of these cause
numbers, the jury found appellant guilty and assessed a punishment of 10 years
in prison and a $10,000 fine.  

 

Cause
numbers 07CR3401 and 07CR3402 were both for possession of child pornography,
resulting in appellate cause numbers 01-09-00830-CR and 01-09-00831-CR,
respectively.  See Tex. Penal Code Ann.
§ 43.26 (Vernon 2003) (stating elements for offense of possession of child pornography).  For both of these cause numbers, the jury
found appellant guilty and assessed a punishment of 10 years in prison and a
$10,000 fine for each offense.

 

Cause
number 09CR1188 was for aggravated sexual assault of a child for putting his
mouth on Bro.E.’s vagina, resulting in appellate cause number
01-09-00833-CR.  Cause number 09CR1189
was for aggravated sexual assault of a child for causing his sexual organ to
contact Bri.E.’s mouth, resulting in appellate cause number
01-09-00832-CR.  See Tex. Penal Code Ann.
§ 22.021 (Vernon Supp. 2009) (stating elements for offense of aggravated sexual
assault of child).  For both of these
cause numbers, the jury found appellant guilty and assessed a punishment of
life in prison and a fine of $10,000.





[2]
          Appellant made a motion to
suppress the evidence of the computers and any evidence found on the computers,
arguing that the search warrant was not supported by probable cause to seize
the computers.  The trial court denied
the motion.  We discuss the details of
appellant’s motion to suppress and the search warrant and supporting affidavit
in our analysis of appellant’s seventh issue.





[3]
          We note that appellant’s indictments for sexual performance by a child
did not specify that the “sexual conduct” was lewd exhibition of the female
breast below the areola.  Thus, the State
could meet its burden to prove that the performance by either complainant
included “sexual conduct” by proving the acts listed in the definition of
sexual conduct, which includes, among other things, sexual contact,
masturbation, and lewd exhibition of the genitals, anus, or any portion of the
female breast below the top of the areola. 
See Tex. Penal Code Ann. § 43.25(a)(2).





[4]
          We also note that sexual
performance by a child is a conduct-oriented offense in which the legislature
criminalized very specific conduct.  Cf. Vick v. State, 991 S.W.2d 830,
832–33 (Tex. Crim. App. 1999) (holding that aggravated sexual assault of a
child statute “is a conduct-oriented offense in which the legislature criminalized
very specific conduct of several different types”).  Thus, each victim also constitutes an
allowable unit of prosecution.  See Ex parte Gonzalez, 147 S.W.3d 474,
477 (Tex. App.—San Antonio 2004, pet. ref’d) (“With conduct-oriented statutes,
each victim is the allowable unit of prosecution.”).  Here, we conclude that a single instance of
production of a sexual performance—i.e.,
production of one photographic performance—that involves more than one child—i.e., where both
complainants posed together—could
result in more than one offense.  See id.