**Opinion issued March 3, 2016**



In The

# Court of Appeals

For The

# First District of Texas

————————————

## NO. 01-15-00675-CR

————————————

## JAVIER MORENO, Appellant

## V.

## THE STATE OF TEXAS, Appellee

On Appeal from the 174th District Court
Harris County, Texas
Trial Court Case No. 1038733

## MEMORANDUM OPINION

Appellant, Javier Moreno, was found guilty by the trial court of the offense of indecency with a child. The trial court sentenced him to four years in prison. Appellant raises two issues on appeal. He asserts that the evidence was not

sufficient to support the judgment of conviction, and he contends that he received ineffective assistance of counsel during the guilt-innocence phase of trial.

We affirm.

## Background

J.M. was born in April 1989. She is Appellant's oldest child. On August 5, 2004, fifteen-year-old J.M. had an argument with her mother, Maria. During the argument, J.M. told Maria that Appellant had "touched" her.

Maria contacted the police. She also took J.M. to the Children's Assessment Center (CAC). There, J.M. met with a caseworker and gave a videotaped interview. During the interview, J.M. described to the caseworker how, when she was nine and ten years old, Appellant would return home drunk, come into her bedroom while she was asleep, and touch the outside of her vagina and her breasts with his hand. She stated that, in addition to her bedroom, Appellant had sexually abused her in her parent's bedroom and in the living room. J.M. told the interviewer that Appellant had also made her touch his penis when she was ten years old.

The CAC interviewer asked J.M. how many times Appellant had touched her inappropriately. J.M. responded that she did not know but reiterated that it happened when her father came home drunk. J.M. also indicated that it happened when her mother was at work.

J.M. stated that, when she was 11 years old, she "had the guts" to tell Appellant to stop. She told him, if he did not stop, she would tell her mother. J.M. indicated that Appellant stopped sexually abusing her after that.

J.M. also indicated that she did not tell anyone about the abuse when she was younger. She stated that she had only recently told her mother. Before telling her mother, J.M. said that she had told her aunt, Karla, about the abuse.

During the interview, J.M. appeared upset and hesitant to discuss the sexual abuse by her father. She cried at times throughout the interview and spoke softly.

A number of months later, Appellant voluntarily went to the CAC. Appellant did not have an appointment and arrived at the CAC completely of his own volition. Once there, he spoke to Sergeant Smejkal, who was employed by the Harris County Sheriff's Department and assigned to the Child Abuse Division of the CAC. Sergeant Smejkal asked Appellant if he would give a statement, and Appellant agreed.

Appellant told Sergeant Smejkal in Spanish what had occurred between him and J.M. Sergeant Smejkal, who speaks conversational Spanish, typed in English what Appellant had told him in Spanish. To ensure that Appellant understood what was stated in the typed statement, Sergeant Smejkal had Appellant read the typed statement and, line by line, tell Sergeant Smejkal in Spanish what the statement said.

Appellant's statement provided, in part, as follows:

> When my daughter was 12 years of age I touched her on vagina. I was outside drinking beer. I was drunk. I then went inside to my bedroom. I layed down. After this [J.M.] came and layed down in the bed. I touched her on the skin of her vagina. I did this for about 10 or 15 minutes. While I was doing this I was rubbing her vagina. After I finished doing this [J.M.] left and went to her room. After I saw [J.M.] leave the room I stayed in my bed drunk. My wife was in the living room sleeping when this happened. The next day [J.M.] did not talk to me.
>
> I believe [J.M.] told her Aunt Carla about what took place. This I believe is how this came out. This was the only time I ever touched [J.M.]. I thought [J.M.] was my wife when she came to my bed.

On November 18, 2005, Appellant was indicted for the felony offense of indecency with a child. The indictment alleged that, "on or about May 1, 2000, [Appellant] unlawfully, intentionally and knowingly engage[d] in sexual contact with [J.M.], a child under the age of seventeen years and not [Appellant's] spouse . . . by touching [J.M.'s genitals] with the intent to arouse and gratify [his] sexual desire." Appellant pleaded guilty to the offense and was placed on deferred adjudication community supervision for eight years in February 2007.

On July 6, 2012, Appellant filed an application for writ of habeas corpus. He asserted that, because of his guilty plea, he would be deported because he was not a United States citizen. He claimed that his guilty plea had been involuntary because his attorney, at the time of the plea, had not advised him that his guilty

4

plea would result in his deportation. The record reflects that Appellant's habeas relief was granted and the 2007 judgment was "set aside."

Appellant's case was re-tried in July 2015. Appellant waived his right to a jury, and the case was tried to the bench.

J.M. and her mother, Maria, were subpoenaed by the State to testify. Neither were cooperative witnesses. At the time of trial, J.M. was 26-years-old. She was married and the mother of three step-children. J.M. testified that she remembered arguing with Maria on August 5, 2004, but she stated that she did not remember what had been said during the argument. J.M. stated that she did not remember telling her mother that Appellant had touched her vagina. She also did not remember telling her aunt that Appellant had touched her vagina.

J.M. testified that she did remember that the police had come to her house the day of the argument, but she did not remember speaking to them. She also recalled going to the CAC, but she claimed that she did not remember what she had said during the interview.

J.M. remembered meeting with prosecutors a few months before trial. She recalled that, at the meeting, she had acknowledged that she had made allegations of abuse against her father in the past. However, she also testified that she had told the prosecutors at the meeting that the allegations had not been true. J.M. acknowledged that she had refused the State's request for her to watch the video-

5

taped CAC interview before trial. At trial, J.M. agreed that she did not want to be in court and that she wished the case would "go away."

J.M. testified that she has been previously treated in a psychiatric hospital "because I tried hurting myself." J.M. stated, "I know I drank gasoline, I cut myself, I overdosed on pills."

J.M.'s aunt, Karla, also testified at trial. Karla testified that, in 2004, she and J.M. had a close relationship. Karla recalled visiting the home of J.M.'s family in July 2004. During that visit, Karla found J.M. in her bedroom, lying on the bed. She could tell that something was wrong with J.M.

During trial, Karla was not permitted to testify regarding what J.M. had told her during her July 2004 visit. However, Karla did testify that J.M. had cried, and that she had hugged J.M. during that visit. Karla testified that she was upset by what J.M. had told her that day. Karla also told J.M. that she needed to tell her mother, Maria, what she had told Karla. The next month is when J.M. told Maria that Appellant had sexually abused her.

When Maria testified at trial, she, like J.M., stated that she could not remember much of what had occurred in 2004 with regard to the sexual abuse allegations against Appellant. Maria did recall J.M. telling her, during the August 5, 2004 argument, that Appellant had "touched her." However, Maria indicated that since then, J.M. has recanted her accusations against Appellant. Maria

stressed that she and her daughter have repeatedly told the prosecutors that J.M.'s allegations of sexual abuse were not true, and she testified that J.M. provided a notarized statement to prosecutors stating that the allegations were untrue. Maria also testified that she felt "tormented" by the prosecutors because they told her she would be put in jail if she refused to testify.

Maria testified that, after J.M. made the allegations against Appellant in 2004, she took J.M. to see a psychologist. However, J.M. did not like the psychologist. As a result, Maria did not take J.M. to see the psychologist again.

The video of J.M.'s 2004 CAC interview, in which she described Appellant's sexual abuse of her, was also offered into evidence by the State. The defense objected to the video on the basis that it was not audible. The record shows that J.M., her attorney, and the court reporter indicated, to varying degrees, that they had difficulty understanding what was being said in the video. Overall, the consensus was that the CAC interviewer was easier to understand than J.M. in the video. The court interpreter, who was translating the proceedings into Spanish for Appellant, stated that she was translating what she could understand in the video.

After the defense's objection, the trial court stated that it was listening to the video, thereby indicating that it could hear the audio:

> [The defense]: Judge, I cannot hear. It's not audible, Judge. I mean, I renew my objection.

7

The Court: I'm listening to it, sir. What else?

[The defense]: That's it.

The Court: Overruled.

Dr. Danielle Madera, a staff psychologist at the Children's Assessment Center, also testified. Dr. Madera was offered as an expert witness "in the field of child sexual abuse and sex offenses." Dr. Madera also viewed the video of J.M.'s CAC interview. With regard to the video, Dr. Madera stated that she could hear "all of what the interviewer was saying and 20 percent of what [J.M.] was saying." In the video, the interviewer had repeated back to J.M. what J.M. had said in response to the interviewer's questions. Dr. Madera testified that this is a normal interview technique.

Dr. Madera observed that, in the video, J.M. "appeared very tearful, ashamed as evidenced by her looking down, crying at several different points, and talking about being fearful of what the outcome was going to be of her making this disclosure." Dr. Madera testified that J.M.'s behavior in the video was consistent with that of a sexual-abuse victim.

According to Dr. Madera, it is not normal for a sexual-abuse victim to claim that she does not remember making an outcry of sexual abuse. However, Dr. Madera indicated that, if the victim has not had therapy, she may not have processed what happened. Dr. Madera stated that, when a victim claims not to

8

remember, it is often because the victim "can't tolerate remembering because they haven't been able to process the abuse, not specifically that they don't remember the whole incident." She also testified that children, especially teenagers, who have been sexually abused often self-harm, including cutting themselves and experiencing suicidal ideations.

Dr. Madera further testified that approximately 20 percent of children who report sexual abuse later recant and claim that the sexual abuse never happened. Dr. Madera indicated that there are many reasons that children recant. She stated that a child may recant because she fears a parent being sent to prison or because she feels pressured by her family to recant.

Dr. Madera also stated that only two to four percent of child abuse cases are "made up." Dr. Madera stated that children do not usually lie about sexual abuse by their father because it is "embarrassing, it's very shameful. It's not something that children make up." Dr. Madera testified that, when children do lie about abuse, it is usually a younger child, involved in a contentious custody battle. She stated that, in her experience, she has never seen a teenager lie about sexual abuse.

Appellant's written statement, made at the CAC with Sergeant Smejkal's assistance, was also admitted into evidence. Relevant to the statement, the defense elicited testimony from several witnesses, which indicated that Appellant did not speak English very well; Appellant's first language is Spanish.

Sergeant Smejkal testified that he spoke Spanish, and he was able to converse with Appellant. Sergeant Smejkal stated that he typed Appellant's statement in English but had Appellant read the statement to him, line-by-line, in Spanish to ensure that Appellant understood what the statement said. Sergeant Smejkal testified that the written statement was "a true representation" of what Appellant had told him at the CAC.

After hearing the evidence, the trial court found Appellant guilty of the offense of indecency with a child. The trial court sentenced Appellant to four years in prison. This appeal followed in which Appellant raises two issues.

## Sufficiency of the Evidence

In his first issue, Appellant asserts that the evidence was not sufficient to support the judgment of conviction.

### A. Standard of Review

We review the sufficiency of the evidence establishing the elements of a criminal offense for which the State has the burden of proof under the single sufficiency standard set out in *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979). *See Matlock v. State*, 392 S.W.3d 662, 673 (Tex. Crim. App. 2013); *Brooks v. State*, 323 S.W.3d 893, 912 (Tex. Crim. App. 2010). Pursuant to the *Jackson* standard, evidence is insufficient to support a conviction if, considering all the record evidence in the light most favorable to the verdict, no

rational fact finder could have found that each essential element of the charged offense was proven beyond a reasonable doubt. *See Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789; *In re Winship*, 397 U.S. 358, 361, 90 S. Ct. 1068, 1071 (1970); *Laster v. State*, 275 S.W.3d 512, 517 (Tex. Crim. App. 2009); *Williams v. State*, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007). We can hold evidence to be insufficient under the *Jackson* standard in two circumstances: (1) the record contains no evidence, or merely a "modicum" of evidence, probative of an element of the offense, or (2) the evidence conclusively establishes a reasonable doubt. *See Jackson*, 443 U.S. at 314, 318 & n.11, 320, 99 S. Ct. at 2786, 2789 & n.11; *see also Laster*, 275 S.W.3d at 518; *Williams*, 235 S.W.3d at 750.

The sufficiency-of-the-evidence standard gives full play to the responsibility of the fact finder to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *See Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789; *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007). An appellate court presumes that the fact finder resolved any conflicts in the evidence in favor of the verdict and defers to that resolution, provided that the resolution is rational. *See Jackson*, 443 U.S. at 326, 99 S. Ct. at 2793.

In our review of the record, direct and circumstantial evidence are treated equally; circumstantial evidence is as probative as direct evidence in establishing the guilt of an actor, and circumstantial evidence alone can be sufficient to

11

establish guilt. *Clayton*, 235 S.W.3d at 778. Finally, "[e]ach fact need not point directly and independently to the guilt of the appellant, as long as the cumulative force of all the incriminating circumstances is sufficient to support the conviction." *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007).

**B.    Elements of the Offense**

A person commits the offense of indecency with a child if the person, with a child younger than seventeen years of age and not the person's spouse, engages in sexual contact with the child or causes the child to engage in sexual contact. TEX. PENAL CODE ANN. § 21.11(a)(1) (Vernon 2011). "Sexual contact" means the following acts, "if committed with the intent to arouse or gratify the sexual desire of any person: . . . any touching by a person, including touching through clothing, of the anus, breast, or any part of the genitals of a child." *Id.* § 21.11(c)(1). The specific intent required may be inferred from a defendant's conduct and remarks, and all of the surrounding circumstances. *Bazanes v. State*, 310 S.W.3d 32, 40 (Tex. App.—Fort Worth 2010, pet. ref'd).

**B.    Analysis**

The CAC video, containing the interview of J.M., was sufficient evidence to prove, beyond a reasonable doubt, each element of the offense of indecency with a child. Although portions of the video are inaudible, J.M.'s description of the sexual abuse by Appellant in the video is audible. J.M. can be heard to say that,

when she was nine and ten years old, her father, Appellant, would come home drunk, come into her bedroom, and touch the outside of her vagina and her breasts with his hand. J.M. did not know how many times this occurred but stated that it occurred when her mother was working and Appellant came home drunk. She said that Appellant also sexually abused her in her parent's bedroom and in the living room. J.M. stated that the abuse stopped when she was 11 years old because she threatened to tell her mother.

In his brief, Appellant asserts that the evidence was insufficient to support his conviction because J.M. was not a credible witness. Appellant points out that J.M. testified at trial that she did not remember telling her mother in 2004 that Appellant had touched her vagina. He also cites J.M.'s testimony in which she recalled indicating to prosecutors, several months before trial, that she remembered telling her mother about the allegations but that the allegations were not true.

As the State points out, J.M. never expressly testified that Appellant did not sexually abuse her. Instead, J.M. testified that, at the time of trial, she did not remember telling her mother, her aunt, the police, or the interviewer at CAC about the abuse. The closest J.M. came to recanting her allegations of sexual abuse was when she agreed that she remembered telling prosecutors several months before trial that what she had told her mother about the abuse was not true.

Even considering J.M.'s testimony to constitute a recantation of her early claims of sexual abuse, the trial court, as the trier of fact, was the judge of the credibility of the witnesses and could have chosen to believe all, some, or none of J.M.'s testimony. *See Wise v. State*, 364 S.W.3d 900, 903 (Tex. Crim. App. 2012) ("The factfinder exclusively determines the weight and credibility of the evidence."). In assessing J.M.'s credibility, the trial court could have considered J.M.'s conduct during trial. J.M. admitted that she did not want to be at trial and wanted the case to "go away." J.M. repeatedly claimed to have no memory of any of the conversations she had in 2004 with her mother, aunt, police, or the CAC interviewer regarding her allegations of abuse.

The trial court also could have considered J.M.'s demeanor during the videotaped interview. J.M. appeared distressed, tearful, and soft-spoken. Dr. Madera, an expert in the field of sexual abuse, testified that J.M.'s demeanor during the interview was consistent with that of a sexual-abuse victim. Dr. Madera further testified that child sexual-abuse victims also self-harm, and the evidence showed that J.M. has engaged in self-harming behaviors.

In addition, Dr. Madera testified that approximately 20 percent of sexual-abuse victims later recant their claim of sexual abuse. In line with Dr. Madera's testimony, the trial court may have believed that J.M. recanted her claim of abuse because she felt pressured by her family or felt guilty about her father's

incarceration. Dr. Madera also testified that, while two to four percent of sexual-abuse claims are false, she has never seen a teenager make a false claim of sexual abuse.

When a witness recants prior testimony, the factfinder determines whether to believe the original statement or the recantation and is fully entitled to disbelieve a witness's recantation. *See Chambers v. State*, 805 S.W.2d 459, 461 (Tex. Crim. App. 1991); *see also Bargas v. State*, 252 S.W.3d 876, 888 (Tex. App.—Houston [14th Dist.] 2008, no pet.) (holding that outcry testimony retains probative value even if contradictory evidence admitted); *Saldana v. State*, 287 S.W.3d 43, 60 (Tex. App.—Corpus Christi 2008, pet. ref'd) ("Furthermore, when a witness recants prior testimony, it is up to the fact finder to determine whether to believe the original statement or the recantation."). Based on the record, the trial court was entitled to believe J.M.'s statement, made in the CAC video, revealing that Appellant sexually abused her from the ages of nine to eleven, and the trial court was also entitled to disbelieve J.M.'s trial testimony to the extent that it indicated Appellant never abused her. In finding Appellant guilty, the trial court implicitly resolved the conflicting evidence and made a credibility determination to believe J.M.'s statement in the CAC video and not believe her recantation. We afford almost complete deference to this determination. *See Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789; *Thornton v. State*, 425 S.W.3d 289, 303 (Tex. Crim. App. 2014).

Moreover, Appellant's written statement supported the guilty finding. In the statement, Appellant admitted to touching J.M.'s vagina. Appellant claimed, however, that he had been drunk and had mistaken J.M. for his wife when he touched her vagina. As the State points out, the trial court, as the finder of fact, was free to believe the inculpatory portion of Appellant's statement and to disbelieve the exculpatory portion. *See Trenor v. State*, 333 S.W.3d 799, 809 (Tex. App.—Houston [1st Dist.] 2010, no pet.) (noting jury free to believe or disbelieve all or part of appellant's statements). In other words, the trial court was free to believe that Appellant had touched J.M.'s vagina while at the same time disbelieving that Appellant had mistaken J.M. for his wife.

Viewing the evidence in a light most favorable to the verdict, we conclude a rational fact finder could have found, beyond a reasonable doubt, each element necessary to support the finding that Appellant committed the offense of indecency with a child. Accordingly, we hold that the evidence was sufficient to support the judgment of conviction.

We overrule Appellant's first issue.

## Ineffective Assistance of Counsel

In his second issue, Appellant asserts that he received ineffective assistance of counsel during the guilt-innocence phase of trial.

## A.      Applicable Legal Principles

To prevail on a claim of ineffective assistance of counsel, an appellant must show the following: (1) counsel's performance fell below an objective standard of reasonableness and (2) a reasonable probability exists that, but for counsel's errors, the result would have been different.  *See Strickland v. Washington*, 466 U.S. 668, 687–88, 694, 104 S. Ct. 2052, 2064, 2068 (1984); *Lopez v. State*, 343 S.W.3d 137, 142 (Tex. Crim. App. 2011).  "A reasonable probability is a probability sufficient to undermine confidence in the outcome."  *Strickland*, 466 U.S. at 694, 104 S. Ct. at 2068.  In reviewing counsel's performance, we look to the totality of the representation to determine the effectiveness of counsel, indulging a strong presumption that counsel's performance falls within the wide range of reasonable professional assistance or trial strategy.  *See Robertson v. State*, 187 S.W.3d 475, 482–83 (Tex. Crim. App. 2006).

Appellant has the burden to establish both prongs by a preponderance of the evidence.  *Jackson v. State*, 973 S.W.2d 954, 956 (Tex. Crim. App. 1998). "An appellant's failure to satisfy one prong of the *Strickland* test negates a court's need to consider the other prong."  *Williams v. State*, 301 S.W.3d 675, 687 (Tex. Crim. App. 2009).

**B.     Analysis**

Appellant asserts that his trial counsel's performance was deficient because he failed to raise the defense of mistake of fact during the guilt-innocence phase of trial. The affirmative defense of mistake of fact provides, "It is a defense to prosecution that the actor through mistake formed a reasonable belief about a matter of fact if his mistaken belief negated the kind of culpability required for commission of the offense." TEX. PENAL CODE ANN. § 8.02(a) (Vernon 2011).

Appellant claims that he was entitled to the defense of mistake of fact based on his written statement. He asserts that the portion of his statement in which he claimed that he had touched J.M.'s vagina only because he was drunk and had mistakenly believed J.M. to be his wife implicates the defense of mistake of fact. Appellant asserts that his trial counsel should have used that portion of his written statement to argue mistake of fact.

Here, trial was to the bench. There was no jury charge. Nonetheless, contrary to Appellant's assertion, the record reveals that trial counsel did rely on the portion of Appellant's statement cited by him on appeal to argue the defense of mistake of fact to the trial court.

At the close of the State's evidence, trial counsel moved for a directed verdict, asserting that the State had failed to prove the elements of the offense. In requesting a directed verdict, Appellant's trial counsel averred: "The [written]

18

statement that they offered says that my client was drunk and he thought it was his wife he was hugging, and he had no intention of sexual satisfaction with his daughter. It was, if anything, mistaken identity." In other words, trial counsel asserted that the written statement demonstrated that Appellant did not have the intent to commit the offense of indecency with a child because Appellant mistakenly believed J.M. to be his wife at the time he touched J.M.'s vagina. Later, during closing argument, counsel again referenced this argument. We agree with the State that, although he did not use the precise words "mistake of fact," trial counsel did argue the defense of mistake of fact to the trial court, utilizing the portion of the written statement cited by Appellant as supporting that defense.[1]

Moreover, Appellant appears to assert that any "mistake of fact" he made regarding identity was due to his intoxication. We note, however, that voluntary intoxication is no defense to prosecution. *See* TEX. PEN. CODE ANN. § 8.04(a) (Vernon 2011); *see also Taulung v. State*, 979 S .W.2d 854, 856 n.1 (Tex. App.—Waco 1998, no pet.) (holding that defense of mistake of fact not available in sexual-assault case in which defendant admitted to having intercourse without complainant's consent but stated that he had done so under the mistaken belief that the complainant was "[his] own woman" because he was intoxicated).

---

[1] We make no determination whether Appellant's statement provided a proper basis for the defense of mistake of fact in this case. Rather, we evaluate only whether Appellant has met his burden to show whether he received ineffective assistance of counsel at trial based on the argument he raises on appeal.

For these reasons, we conclude Appellant has not demonstrated that his trial counsel's performance fell below an objective standard of reasonableness; thus, he has not satisfied the first *Strickland* prong.  We hold that Appellant has failed to show, by a preponderance of the evidence, that he received ineffective assistance of counsel at trial.  *See Strickland*, 466 U.S. at 687–88, 694, 104 S. Ct. at 2064, 2068.

We overrule Appellant's second issue.

## Conclusion

We affirm the judgment of the trial court.


Laura Carter Higley
Justice

Panel consists of Chief Justice Radack and Justices Keyes and Higley.

Do not publish.  TEX. R. APP. P. 47.2(b).

20