

# NUMBER 13-24-00094-CR

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

CHRISTOPHER GEORGE PAGE,                                       **Appellant,**

**v.**

THE STATE OF TEXAS,                                           **Appellee.**

## ON APPEAL FROM THE 264TH DISTRICT COURT
## OF BELL COUNTY, TEXAS

## MEMORANDUM OPINION

### Before Justices Silva, Peña, and Fonseca
### Memorandum Opinion by Justice Fonseca

A Bell County jury convicted appellant Christopher George Page of aggravated assault with a deadly weapon causing serious bodily injury to a person with whom he had a dating relationship, a first-degree felony. *See* TEX. PENAL CODE ANN. § 22.02(b)(1)(A). Page pleaded true to enhancement paragraphs alleging that was a habitual felony offender, and the trial court sentenced him to thirty-six years' imprisonment. *See id.*

§ 12.42(d) (mandating a minimum prison term of twenty-five years upon a felony conviction where the defendant was twice previously convicted of felonies). On appeal, Page argues the evidence was insufficient to support his conviction. We affirm as modified.[1]

## I.    BACKGROUND

Killeen resident Marisol Solis-Audelo testified that, on the evening of December 20, 2020, a young male neighbor came to her door asking for help. The boy "looked very scared" and said "[m]y mom is hurt" and "[m]y dad hurt her." Solis-Audelo called 911 and then went to the boy's house, where she saw his mother, Lashawn Fletcher, lying on the floor bleeding and badly injured. Solis-Audelo said that Fletcher "could hardly move" and "kept talking about [how] she was hurting."

Officer John Castro of the Killeen Police Department (KPD) arrived at the scene. He said there was blood "[a]ll over the place," including on the "ceiling, the walls, the floor, [and] her body." He noticed that Fletcher had bruises all over her body and "some lacerations" but could not tell exactly where the blood was coming from. Castro then testified:

> I saw what looked like a big piece of stick or rod, broken into multiple pieces all over the bedroom—the bedroom itself, on the floor. And she had shards of that wood[—]pieces all over her, around her body, stuck to the shirt, and around her where she was laying. . . . I believed someone had struck her multiple times with that piece of rod, as it was—the—her marks on her body were kind of consistent with getting hit by a stick like that.

Video footage obtained from Castro's bodycam was entered into evidence and played for the jury.

---

[1] This appeal was transferred from the Third Court of Appeals in Austin pursuant to an order issued by the Texas Supreme Court. *See* TEX. GOV'T CODE ANN. § 73.001. We are required to follow the precedent of the transferor court to the extent it differs from our own. TEX. R. APP. P. 41.3.

While Castro was trying to get information from Fletcher, a young girl who was inside the house told him that "[m]y dad did this" and that "[h]e hit me[,] my brother[,] and my mom." The girl identified her father as Page, and police began searching for him. The girl "complained of being hit and in pain on her rib cage," and Castro observed a "cylindrical injury" on her rib cage similar to the injuries suffered by Fletcher. Castro also spoke to the young boy who sought his neighbor for help. Castro observed a "lump" on the boy's forehead and a "cylindrical" injury on his leg.

Fletcher and both children were taken to Baylor Scott & White Clinic for examination and treatment. When nurse Selena McCormick asked Fletcher's daughter why she had been brought to the hospital, the child answered: "My Daddy beat my Mommy to death. He beat us to death too." According to McCormick, the girl reported:

> He couldn't find his glasses. He started thinking my Mom was having men over, like taking his glasses. He pushed my Mom to the ground and grabbed the stick and started hitting her. . . . Have us look for his glasses or we'll get hit with the stick. He said he was going to kill everyone in the house.

She told McCormick that Page hit her on her arms, legs, and sides with "[a] wooden circle stick that we have in our closet." She said her half-brother "was trying to get the stick from him and [Page] beat him up" as well.

Another nurse, Camille Miles, testified that she examined Fletcher's son, who reported to her that Page, his "step-dad," "hit [him] with a stick" because "[h]e was looking for some . . . expensive glasses" but "[c]ouldn't find them." The child also reported to Miles that Page hit his mother and sister with the stick.

A third nurse, Misty Bennett, examined Fletcher. She stated that Fletcher had "pattern injuries" all over her body, meaning "there is a consistency all throughout the patient's body where you can tell that how the injury occurred was likely from the same

3

object." The injuries exhibited "central sparing," which means "that the middle of the bruise or the injury, you don't really see the specific injury, but you see it on the outside" and is typically made by "cylindrical objects." Overall, Fletcher had "too many [injuries] to count." Bennett opined within a reasonable degree of medical certainty that Fletcher had been struck with a blunt object and that the injuries placed her at a substantial risk of serious injury or death.

When Bennett asked for the name of Fletcher's assailant, Fletcher replied, "Chris Page." However, Fletcher could not describe how she received the injuries. Instead, she told Bennett:

> I don't even remember how I got on the floor. I don't remember falling. I just remember waking up and I hurt. I hurt so bad. . . . I just remember talking to him . . . I think it was about glasses. Then I woke up on the floor and then I woke up here. . . . [L]ook at me. He had to be so mad.

Fletcher agreed with Bennett that "she has had [a] history of abuse by" Page; she also told Bennett that she previously experienced abuse at the hands of "another person."

KPD investigator Ramiro Martinez testified that he obtained a warrant for Page's arrest for the assaults of Fletcher and the two children, and Page was arrested in Knoxville, Tennessee on January 12, 2021. Martinez agreed on cross-examination that, though he found "at least two" cell phones in Fletcher's house during his investigation, he did not collect or analyze them for evidence; moreover, no DNA or fingerprint evidence was recovered from the scene. He agreed that, when he went to interview Fletcher "several days" after the assault, she "didn't remember anything." He did not interview Page or the children.

At trial, Fletcher testified that she had been in a dating relationship with Page for twelve years until they split up in 2019. They have one daughter together, while Fletcher's

4

son was born of a previous relationship. Fletcher testified she remembers nothing about what happened on December 20, 2020, except waking up in the hospital. She denied telling a nurse that there was a dispute "about glasses" or that Page was her assailant.

Fletcher's and Page's daughter, twelve years old at the time of trial, testified on behalf of the defense. When asked what happened on December 20, 2020, she testified "I don't remember." She later acknowledged remembering that her mother was injured and taken by ambulance to the hospital that day. The child did not recall her father being at their house that day, she did not recall being struck by an object, and she did not recall seeing her mother or brother being hit by anything.

Page testified that, on December 20, 2020, he was in the process of driving to Knoxville "to expand [his] business"[2] and was "nowhere near Texas." When asked why his daughter would report to police and nurses that he assaulted Fletcher, Page said "I believe my daughter was more upset at me for not being there. And she just maybe said it or maybe she was coerced." When asked why Fletcher's son would report the same thing, Page said "his mental capacity is not all the way there" and "I believe his sister helped him up and to the point where he was shaking his head yes and no."

Page was convicted as charged[3] and this appeal followed.

## II.    EVIDENTIARY SUFFICIENCY

### A.    Standard of Review and Applicable Law

To satisfy constitutional due process requirements, a criminal conviction must be

---

[2] Page testified that he operated a restaurant and a janitorial service.

[3] In separate cause numbers tried together with the instant charge, Page was also convicted of causing injury to the two children. *See* TEX. PENAL CODE ANN. § 22.04. Those convictions are not at issue in this appeal.

5

supported by sufficient evidence. *Baltimore v. State*, 689 S.W.3d 331, 340 (Tex. Crim. App. 2024). "Evidence supporting a conviction is legally sufficient if a rational trier of fact could have found that the defendant committed each element of the offense beyond a reasonable doubt." *Id.* (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). In a sufficiency review, we view the evidence in the light most favorable to the verdict and consider all of the admitted evidence. *Stahmann v. State*, 602 S.W.3d 573, 577 (Tex. Crim. App. 2020). We consider both direct and circumstantial evidence as well as all reasonable inferences that may be drawn from the evidence and are not mere speculation. *See id.*; *Villa v. State*, 514 S.W.3d 227, 232 (Tex. Crim. App. 2017); *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007). "The jury is the sole judge of credibility and weight to be attached to the testimony of the witnesses"; therefore, "[w]hen the jury could reasonably draw conflicting inferences, we presume that the jury resolved the conflicts in favor of the verdict." *Stahmann*, 602 S.W.3d at 577; *see* TEX. CODE CRIM. PROC. ANN. art. 38.04.

Sufficiency is measured by the elements of the offense as defined by a hypothetically correct jury charge. *Curlee v. State*, 620 S.W.3d 767, 778 (Tex. Crim. App. 2021) (citing *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997)). A hypothetically correct charge in this case would instruct the jury to return a guilty verdict if it found beyond a reasonable doubt that: (1) Page intentionally, knowingly, or recklessly caused serious bodily injury to Fletcher; (2) he used a deadly weapon during the commission of the assault; and (3) Fletcher is a person whose relationship to or association with Page is described by Texas Family Code §§ 71.0021(b), 71.003, or 71.005. *See* TEX. PENAL CODE ANN. § 22.02(b)(1)(A). "Serious bodily injury" means "bodily

6

injury that creates a substantial risk of death or that causes death, serious permanent disfigurement, or protracted loss or impairment of the function of any bodily member or organ." *Id.* § 1.07(a)(46).

## B.     Discussion

Page does not dispute the sufficiency of the evidence to show that a deadly weapon was used during the commission of the assault, that Fletcher suffered serious bodily injury, or that he and Fletcher were in a dating relationship as defined in the family code. *See* TEX. FAM. CODE ANN. § 71.0021 (providing that "dating relationship" means "a relationship between individuals who have or have had a continuing relationship of a romantic or intimate nature"). Nor does he dispute that, according to the evidence, whoever assaulted Fletcher did so with the requisite mental state. *See* TEX. PENAL CODE ANN. § 6.03(a)–(c) (defining intentionally, knowingly, and recklessly). Instead, Page challenges the sufficiency of the evidence to support the identity element of the offense. He argues that "there is at best only a modicum of probative evidence that [he] was the perpetrator who beat Fletcher." *See Jackson*, 443 U.S. at 320 ("Any evidence that is relevant . . . could be deemed a 'mere modicum.' But it could not seriously be argued that such a 'modicum' of evidence could by itself rationally support a conviction beyond a reasonable doubt.").

We disagree. The evidence included testimony by Solis-Audelo and Miles that Fletcher's son reported that Page assaulted Fletcher. It also included testimony by Castro and McCormick that Fletcher's daughter reported the same thing. Though this testimony was hearsay—i.e., out-of-court statements offered into evidence to prove the truth of the matter asserted, *see* TEX. R. EVID. 801(d)—Page does not argue that it was inadmissible.

7

*See* TEX. R. EVID. 803, 804 (setting forth various exclusions and exceptions to the rule against hearsay). Even if it was inadmissible, we must consider it in our sufficiency analysis because no objection was made to it at trial. *See* TEX. R. EVID. 802 ("Inadmissible hearsay admitted without objection may not be denied probative value merely because it is hearsay."); *Stahmann*, 602 S.W.3d at 577. Further, although Fletcher and her daughter recanted their statements at trial,[4] the jury was free to disbelieve their trial testimony and to instead believe the other witnesses' testimony regarding what they said immediately after the assault. *See Chambers v. State*, 805 S.W.2d 459, 461 (Tex. Crim. App. 1991) (noting that "[t]he jury observed the complainant's demeanor and was entitled . . . to disbelieve her recantation" of earlier videotaped testimony); *Saldana v. State*, 287 S.W.3d 43, 60 (Tex. App.—Corpus Christi–Edinburg 2008, pet. ref'd) ("A fact finder is fully entitled to disbelieve a witness's recantation."). Similarly, the jury was free to disbelieve Page's uncorroborated alibi. *See* TEX. CODE CRIM. PROC. ANN. art. 38.04. Martinez's testimony that Page was apprehended in Tennessee around three weeks after the assault is also circumstantial evidence supporting the jury's verdict. *See Clay v. State*, 240 S.W.3d 895, 905 n.11 (Tex. Crim. App. 2007) (noting that flight evinces a consciousness of guilt).

On appeal, Page principally complains about the credibility of Fletcher's report to Bennett identifying him as the assailant.[5] He argues that "[t]he statements initially attributed to Fletcher about her assailant's identity were made in the hospital while she was still in substantial pain, under heavy medication, and fighting to recover from the injuries she had sustained." He also contends that Fletcher's responses to Bennett

---

[4] Page claims that Fletcher's son also "later denied that [he] intended to implicate [Page]." He does not point to anything in the record supporting this assertion, and we find nothing.

[5] Page did not object to the admission of either Bennett's testimony or her written report, both of which relayed Fletcher's identification of Page as the assailant.

8

"indicate the probability that Fletcher was still confused about the nature of the questions themselves," noting that "when Bennett asked Fletcher if there was [a] history of abuse with Page, Fletcher answered affirmatively." Page additionally states: "Notably, Bennett also testified Fletcher said she had a history of abuse with *another* person but noted Fletcher 'didn't want to talk about that.'"

Page does not explain how Fletcher's responses to Bennett indicated she was confused, nor does he explain why Fletcher's report to Bennett of prior abuse by another person is "notabl[e]." In any event, even excluding Fletcher's statement to Bennett during her examination, sufficient evidence supporting the identity element of the offense came via the hearsay testimony of Solis-Audelo, Castro, Miles, and McCormick. As to this testimony, Page emphasizes that Martinez did not interview the children or Page, and that Page's identity as the perpetrator was not corroborated by any forensic evidence. That may be true, but that does not diminish the probative value of the testimony set forth above, which the jury was entitled to believe. *See Chambers*, 805 S.W.2d at 461 (holding that "the complainant's recantation of her videotaped testimony did not destroy its probative value").

We conclude that the evidence supporting the verdict was more than a mere "modicum," and that a rational juror could have concluded therefrom beyond a reasonable doubt that Page was the individual who assaulted Fletcher on December 20, 2020. *See Baltimore*, 689 S.W.3d at 340. Page's issue on appeal is overruled.

### III.    MODIFICATION OF JUDGMENT

The trial court's written judgment states that Page was convicted of second-degree felony aggravated assault under Texas Penal Code § 22.02(a)(2). *See* TEX. PENAL CODE

ANN. § 22.02(a)(2), (b). In fact, consistent with the indictment and jury verdict, the trial court orally pronounced that Page was convicted of aggravated assault with a deadly weapon causing serious bodily injury to a person with whom he had or previously had a dating relationship, a first-degree felony under penal code § 22.02(b)(1)(A). *See id.* § 22.02(b)(1)(A); *see also Ex parte Madding*, 70 S.W.3d 131, 135 (Tex. Crim. App. 2002) ("When the oral pronouncement of sentence and the written judgment vary, the oral pronouncement controls.").

We have the power to modify a judgment to speak the truth when we are presented with the necessary information to do so. *See Bigley v. State*, 865 S.W.2d 26, 27–28 (Tex. Crim. App. 1993). Accordingly, we modify the judgment to reflect that Page was convicted of aggravated assault with a deadly weapon causing serious bodily injury to a person with whom he had or previously had a dating relationship, a first-degree felony. *See* TEX. PENAL CODE ANN. § 22.02(b)(1)(A).

### IV.    CONCLUSION

The trial court's judgment is affirmed as modified. *See* TEX. R. APP. P. 43.2(b).

> YSMAEL D. FONSECA
> Justice

Do not publish.
TEX. R. APP. P. 47.2(b).

Delivered and filed on the
20th day of March, 2025.